Scofield *et al. vs.* Perkerson *et al.*

LEWIS SCOFIELD *et al.*, plaintiffs in error, *vs.* A. M. PER-
KERSON *et al.*, defendants in error.

MARTIN J. HINTON *et al.*, plaintiffs in error, *vs.* A. M. PER-
KERSON *et al.*, defendants in error.

(McCAY, Judge, did not preside in these cases.)

1. On the abolition of the offices of the Western and Atlantic Railroad,
the Comptroller General became the proper custodian of the books
and records of the road, and the duty of causing the true amount due
by defaulting officers of the road to be ascertained devolved upon him.
2. The Legislature has authority to appoint, by resolution, a committee
of their own body, as ministerial agents, to audit and state the accounts
of the officers and agents of the Western and Atlantic Railroad.
Where such statement shows an officer or agent in default, and is
transmitted by the committee to the Comptroller General, and he
thereupon issues executions against the defaulting officer and his sure-
ties, this Court will presume that he satisfied himself of the correct-
ness of the committee's report by inspection of the books and accounts
of the Western and Atlantic Railroad, and adopted it as his own.
3. The Courts will not entertain jurisdiction to enjoin such execution on
the ground that there is a suit pending, at the instance of the State,
against the defaulting agent and their securities on their bond, or on
the ground that the amount for which the agent is a defaulter, was
fraudulently used and embezzled by him.

Execution against defaulting officer.    Auditing Committee
of the General Assembly.    Principal and security.    Before
Judge HOPKINS.    Fulton Superior Court.    At Chambers,
July 23, 1872.

The two cases above stated being identical in their charac-
ter, were consolidated and heard together.    Lewis Schofield
and Varney A. Gaskill filed their bill, containing, substan-
tially, the following allegations: That on January 1st, 1870,
Foster Blodgett gave his official bond to Rufus B. Bullock,
Governor of the State of Georgia, in the sum of $20,000,
conditioned for the faithful performance of the duties of said
office as therein enumerated, as superintendent of the West-
ern and Atlantic Railroad, and Hannibal I. Kimball, John
Rice, Henry O. Hoyt and your orators, became his securities;

that at a session of the General Assembly, 1871 and 1872, a committee was appointed by said body to investigate the management of the Western and Atlantic Railroad and its finances, as to the fraudulent use or embezzlement of any funds or property belonging to the State, and for other purposes therein enumerated; that said committee investigated the actings and doings of the said Foster Blodgett and alleges that he has in his hands, unaccounted for, $23,-321 67; that said account, as stated, does not appear to be for the earnings of the Western and Atlantic Railroad, but is predicated upon defalcations arising, if at all, in embezzlements from said road, and do not appear to be the earnings thereof; that said Foster Blodgett, superintendent as aforesaid, never sold at public outcry any iron of said road, or collected any of the proceeds of said sales; that said committee had no authority to make any report whatever to the Comptroller General of said State, authorizing him to issue summary execution against Foster Blodgett and his securities, but was only authorized to report to the Legislature by which it was created; that said committee on May 23d, 1872, made out the annexed account and transmitted the same to Madison Bell, Comptroller General, ordering and directing him to issue execution against Foster Blodgett and his securities for $20,000 with twenty per cent. per annum thereon, from January 1st, 1871; that said Comptroller General, upon the authority aforesaid, on May 29th, 1872, did issue an execution against the said Blodgett, and his securities, for $20,-000 and lawful costs; that A. M. Perkerson, deputy sheriff of the county of Fulton, on June 3d, 1872, levied said execution upon complainant's property; that said deputy sheriff has advertised said property to be sold on the first Tuesday in July next; that immediately after the levy of said execution complainants filed their affidavit of illegality to said execution, which said deputy sheriff returned to complainants with the notice that he would disregard the same, a copy of which is hereto attached. Prayer, that said sale be enjoined until the further order of the Court.

Scofield *et al. vs.* Perkerson *et al.*

AFFIDAVIT OF ILLEGALITY.

"Deponents say that said *fi. fa.* is proceeding against them illegally, and was issued against them illegally on the grounds, to-wit:

1st. Because there is no law of this State authorizing the Comptroller General to issue an execution against the superintendent of the Western and Atlantic Railroad.

2d. Because there is no law of this State authorizing the Comptroller General to issue an execution against the securities of the superintendent of the Western and Atlantic Railroad on his official bond.

3d. Because, before the issuing of said execution, no officer of said road had caused the true amount due by said superintendent to be ascertained, as required by law; nor had any amount, so ascertained to be due, been transmitted to the Comptroller General as earnings of the road; nor had any superintendent of said road, nor had any person or officer thereunto lawfully authorized, caused the true amount due by said Foster Blodgett, as superintendent, to be ascertained and transmitted to the Comptroller General, as earnings of the Western and Atlantic Railroad.

4th. Because, at the time of issuing said execution, there were no funds in the hands of said Foster Blodgett, as superintendent of the Western and Atlantic Railroad, and for which his sureties on his official bond were liable, unaccounted for.

5th. Because, before the issuing of said execution, there was no superintendent of the Western and Atlantic Railroad, and the office of superintendent had been abolished by law.

6th. Because, before the issuing of said execution, the said State of Georgia had brought suit in the Superior Court of Fulton county against said Foster Blodgett for all funds and property belonging to the State, alleged to be fraudulently used and embezzled by said Foster Blodgett, or wrongfully converted by him to his own use, and upon which issues are now pending and undisposed of in said Court, as deponents are advised and believe.

7th. Because said execution was issued by the Comptroller General upon an account reported to him by a committee of the Legislature, based upon the alleged fraudulent and wrongful conversion of property and funds belonging to the State, by the said Foster Blodgett, to his own use, and upon such an account there is no authority of law for issuing summary execution by said Comptroller General; and for property and funds, so fraudulently embezzled, the securities upon his said bond are not liable.

The second case is that of Martin J. Hinton, James L. Matthewson, H. O. Hoyt and Ephraim Tweedy, as securities of Foster Blodgett as treasurer of the Western and Atlantic Railroad, against said A. M. Perkerson, deputy sheriff *et al.*, containing substantially the same allegations and the same prayer as the preceding bill. The execution sought to be enjoined by the second bill was for $25,519 44 and costs.

The Chancellor refused the injunction prayed for, in the following decision :

"This is an application for an injunction. The case stands upon the bill and exhibit.

"The allegations are substantially these : On the 1st of January, 1870, Foster Blodgett gave bond as superintendent of the Western and Atlantic Railroad, and complainants and others became his sureties. Blodgett entered upon the duties of the office, and he continued to be superintendent until the office was abolished. At its session, 1871-2, the Legislature of the State appointed a committee to investigate the management of the road, and the management of its finances. That committee investigated the actings of Blodgett, and allege that he has in his hands unaccounted for $23,321 97—a copy of the account being exhibited with the bill. It does not appear by the account that the sums mentioned are of the savings of the road. Nor does it appear to be the true account which has been made up, or caused to have been made up, by the superintendent, but it 'is predicated upon defalcation, arising, if at all, in embezzlements from said road, and do not appear to be the earnings thereof,' as superintendent Blodg-

Scofield *et al. vs.* Perkerson *et al.*

ett has never sold, at public outcry, after advertisement, any iron of the road, nor received any of the proceeds of such sales. The committee have no authority to make report to the Comptroller General, authorizing him to issue execution against Blodgett and his securities.    On the 23d day of May, 1872, the committee made out the account before mentioned, and transmitted it to the Comptroller General of the State, ordering him to issue execution against Blodgett and securities for $20,000, (the penalty of the bond,) with twenty per cent. per annum from January 1st, 1871.    That officer, upon that authority, on the 29th of May, 1872, issued an execution against Blodgett and his securities, for $20,000, and a copy of the execution is exhibited.    It was placed in the hands of defendant, who levied it upon the property of complainants.    Complainants presented an affidavit of illegality, which the defendant returned with notice that he should disregard it, and is proceeding to sell.    The affidavit of illegality is exhibited with the bill.

"Do the complainants in this bill make a case that entitles them to the interposition of the powers of a Chancellor? This is an appeal to the extraordinary powers of the Court, and the plaintiffs are bound to make out a case showing a clear necessity for its exercise.

"It is important to ascertain what relation Foster Blodgett bore to the State.    The Western and Atlantic Railroad is the property, exclusively, of the State.    The superintendent was the chief officer.    Before entering on his duties, he gave bond and security in the sum of $20,000, and the bond was filed and recorded in the office of the Comptroller General.    He had authority to conduct all the operations of the road connected with its repairs, equipment and management, including its financial affairs; to sue, officially, for any claim due the State on account of said road; to see that the books and accounts of the road were so kept as, at all times, to show accurately its official affairs; to sell useless iron, after thirty days' notice, for cash or credit; to have weekly settlements with all fiscal agents of the road for all moneys received by

Scofield *et al. vs.* Perkerson *et al.*

them.   Each agent having funds of the road was required to make out, monthly, and sign a statement of his account, and any officer or agent failing to pay over funds collected by him weekly, or failing to furnish the superintendent with a monthly statement was to be dismissed by him.   When such dismissal took place, an account was to be had at once of all the freight on hand, giving the person dismissed a credit therefor, so as to show the amount of his indebtedness.

"Section 996, Revised Code, is this : 'As soon as an agent, or any other person having funds of the road unaccounted for, is in default, and fails to pay over said funds on demand made by the superintendent, or by his authority, or shall abscond or conceal himself, or in any other way evade or prevent a settlement, said officer shall promptly cause the true amount due by such person to be ascertained and transmit the same to the Comptroller General as earnings of the road, stating also the date of the default.'

"The bonds of all the officers and agents were to be lodged in the Comptroller General's office.   All debtors to the road were as debtors to the State or the public, and 'the remedy of the State against the superintendent, the treasurer, auditor and other officers and agents, is the same as against tax collectors or receivers.'

"The net proceeds of the road were to be paid monthly into the State treasury, and were one of the sources from from which the State does or may derive revenue other than by taxation.

"From this general statement of the various sections of the Code which are applicable to the matter of inquiry, I may assume, as being incontrovertible, that the superintendent, as the chief officer of the road, had the general management of all its affairs, he had power to receive or collect money belonging to it, and when so received, it was his duty to pay it to the treasurer, and to have the transaction appear on appropriate books, to be kept for that purpose.   The books and accounts of the road could not, 'at all times, show accurately the fiscal affairs,' if they failed to disclose an amount

Scofield *et al. vs.* Perkerson *et al.*

of money that might be in the superintendent's hands. Complainants undertook, in their bond, that Blodgett should have these books kept, and that he should pay into the treasury the money that he received. It is conditioned in the bond, as appears from the statement of the public officer who is charged with its custody, that Blodgett should 'well and truly perform all the duties required of him by law, and well, truly and faithfully account for all moneys and property that might come to his hands, by virtue of his appointment, and do all other acts required of him, in said office, according to law and the trust reposed in him.' It is further indisputable, that, for a failure to do his duty, the State had the same remedy against him, whatever that might be, that it had against tax collectors or receivers. That is the express language of the law. The remedy against a tax collector is an execution from the Comptroller General against him and his sureties for the amount of his default. At this point a question of difficulty arises. How is the Comptroller General to be advised of the amount of the superintendent's indebtedness? As to all the other officers and agents there is no trouble. It was the duty of the superintendent to ascertain and transmit the amount as prescribed by section 996. But that section does not apply to the superintendent. It contemplates, on one side, an agent, or any other person, in default, failing to pay on demand, or evading or preventing a settlement, and, on the other side, the superintendent making the demand, and on failure to get a settlement, ascertaining the amount and transmitting it to the Comptroller General. The superintendent is, in the section, on one side, the collecting side. He may be taken out of that, but the difficulty lies in putting him on the other side. Changing the collecting agent would not enlarge the meaning and scope of the other part of the section. It would remain as before, and if, in the beginning, it did not embrace the superintendent, he would not then be embraced.

"I think it is true that the superintendent undertook to faithfully account for the public money and property; that,

on his failure to do so, the Comptroller General was required to issue an execution for the amount of the default, and that there was no express provision of law prescribing the mode of informing the Comptroller General of the amount. And thus the law stood when the office of superintendent was abolished.

"It is better to pause here and look more closely into the remedy that the State has. It is precisely that which it has against tax collectors or receivers.

"By section 911 of the Code, 'if any collector shall fail to settle his accounts with the Comptroller General in the terms of the law, he shall issue execution against him and his sureties for the principal amount, with the penalty and costs.' Section 914 is in these words: 'Executions so issued shall not be suspended or delayed by any judicial interference with them, but the Governor may suspend the collection not longer than the next meeting of the General Assembly.'

"This remedy against the superintendent is an execution from the Comptroller General's office against him and his sureties, and when so issued, it cannot be suspended or delayed by any judicial interference with it, but the Governor may suspend it. Such an execution has been issued in this case, and this bill is filed to interfere with and suspend it.

"When the execution is issued by the Comptroller General, and shows on its face jurisdiction of the person and subject matter, has a Judge the power to look into it and determine whether it shall or shall not proceed? If it issues or is proceeding wrongfully, but is, nevertheless, within the jurisdiction, can the judiciary interfere with it, and suspend or delay it? Is the Executive alone entrusted with that power? The complaint in this case is not that the Comptroller General had not jurisdiction of Blodgett and his sureties, and of the subject matter, but that he was moved to the exercise of the jurisdiction improperly.

"It is a principle pervading our system that the State in the collection of its revenue cannot, as a rule, be interfered with. It is the duty of the collectors, without judgment or

trial, to issue executions against defaulting tax-payers, and section 3618 of the Code reads as follows: 'No replevin shall lie, nor any judicial interference be had, in any levy or distress for taxes under the provisions of this Code, but the party injured shall be left to his proper remedy in any Court of law having jurisdiction thereof.' To force the money from the pocket of the tax-payer, the collector is armed with the power of a process to collect, which, in the language of Judge NISBET, is the highest, in its direct efficacy, known to the usage of constitutional government. With the collection of this revenue there can be no judicial interference, from the making of the demand of the tax-payer until it goes into the State treasury. If the citizen fails to pay, the collector makes him do so; if the collector fails to pay it over after he gets it over, the Comptroller General makes him and his securities do so. It is not because the money arises directly from taxation; there is no peculiar charm in the word taxes, it is because it is a part of the revenue of the State. The principle applies to the public revenue, no matter from what source it arises.

"This statute, on its face, contemplates a case in which wrong may be done to the individual against whom the process runs. It says that the process shall go on, shall do its work without interference, and 'the party injured shall be left to his proper remedy in any Court of law,' etc. Judge NISBET, in Gledney *vs.* Deavors, 8 Georgia Reports, 484, in speaking of the lien of taxes on property, says: 'The State must have her revenue at all hazards, hence these various stringent provisions of the law to restrain judgment. Prompt collection is as necessary as a lien.   *   *   *   *   To collect her taxes, the State turns, with uncontrollable power, directly and instantaneously upon the property; and if, in the exercise of this stern but necessary attribute of sovereignty, the citizen is injured, his only redress is to petition to the Legislature.' In Eve *vs.* the State, 21st Georgia Reports, the Supreme Court, by Judge BENNING, says: 'Whether a claim for taxes is to be exacted or not, is a question everywhere, so

far as I know, for the Executive, not for the judiciary. If the Executive exacts the claim and collects the money and it turns out that the claim was unfounded, the government itself gives redress—sometimes provides a mode by which redress may be obtained through the Courts. In every case, however, the money claimed or tax has first to be paid. If this is not universally true it certainly is generally true.'

" But suppose, although it should appear, as it does in this case, that the Comptroller General has jurisdiction of the person and subject-matter, still the Courts can interfere with the execution, and determine whether that officer proceeded regularly to the exercise of the jurisdiction, that is, that he ascertained the amount in the proper manner. It must be remembered that no complaint is made that the amount claimed is not due from Blodgett. That is not denied in the bill. There is no direct, unequivocal denial of the indebtedness in the affidavit of illegality. Then did the Comptroller General ascertain the amount in a legal manner?

"Execution has been issued. It recites that it is done on the authority of a statement of Blodgett's account, ascertained and made out by a committee of the Legislature. Complainants in that bill allege a want of authority on the part of the committee to ascertain and report the state of the superintendent's account. One of the resolutions passed by the Legislature is in these words:

" *Resolved,* etc., That the committee appointed to investigate the management of the Western and Atlantic Railroad be directed to ascertain and state the accounts of the agents and other persons dealing with the Western and Atlantic Railroad and compel settlement of the same, and upon an amount being ascertained as due the Western and Atlantic Railroad, the State Treasurer be authorized to receive and receipt for the same.'

"That committee states an account containing seven items in this manner:

"Mr. Foster Blodgett, superintendent of the Western and Atlantic Railroad, for the year 1870, debtor to the State of

Georgia, 1870, June 3d, to amount collected of the Scofield Rolling Mill Company, on account of old iron sold them belonging to the Western and Atlantic Railroad.

"Five of them are of a similar character, differing only in amount. Another is for amount collected of the Post Office Department, United States; and the remaining item is ' to amount received of I. P. Harris, Treasurer, etc., of the funds belonging to the Western and Atlantic Railroad, on pass bill seventy-one, July 1870, in the name of J. C. Smith.'

"They transmit this account to the Comptroller General of the State, and certify, ' it is ascertained by the committee of the General Assembly, etc.; that there was due on the 1st day of January, 1871, and is yet due the State of Georgia from Foster Blodgett, superintendent of the Western and Atlantic Railroad, for the year 1870, of the funds of said Western and Atlantic Railroad, in his hands unaccounted for, the sum of $23,331 67,' on the foregoing statement of account; that said sum was received by the said Foster Blodgett, as superintendent aforesaid, during the year 1870 ; that said Foster Blodgett absconds and prevents a settlement of said indebtedness. This statement of indebtedness is hereby transmitted to the Comptroller General that execution issue, according to the statute in such case provided, etc.'

" The resolution required two things of the committee : They were first to ascertain the *state of the accounts* of agents and other persons dealing with the road, and second, to compel settlement of the amount ascertained to be due. How were they to ascertain the state of the accounts, and in what manner were they to compel settlement?

" Accounts were to be kept on the books of the road—the law required that. It does not appear from this bill that the committee changed a figure on those books, or that they heard a word of testimony other than that furnished by the books and papers of the road. It is argued that they did. It is said by counsel that *ex parte* examinations of witnesses were had, and that hearsay testimony and unauthorized opin-

ions were received and acted upon by the committee. It is not for me to inquire what effect, if any, such allegation, had it been made, would have had. It has not been made. There is no intimation in the bill of how the committee ascertains the amount. The presumption of law is that it was done rightly and properly, and nothing whatever is alleged to the contrary. The certificate and account disclose nothing more than an ordinary account of a business tranaction. There is on the face of these papers no other appearance of fraud than that which may exist in law where one person withholds the money of another.

"How were they to compel settlèment? By legal process. Just such means as the law had provided, they were to adopt. They could resort to the Comptroller General's execution or to suit on the official bond. By the Code, section 943, the bond of the collector is not to be sued unless some emergency should make it necessary. The execution is the usual remedy and must be employed, unless some emergency makes it necessary to resort to suit on the bond.

"It is said that this is a hard case, and that by suffering this process to run its course, it may do great injustice to complainants.

"The remedy is a severe one, but every citizen of Georgia since the year 1804 has been subject to it. That it is for a large amount, does not affect the principle. The remedy lies with the Executive.

"Complainants have failed in the bill to make a case that entitles them to an injunction." To which ruling plaintiffs in error excepted, and now assign the same as error.

B. H. Hill & Sons; D. F. & W. R. Hammond; Pope & Brown; A. B. Culberson; Gartrell & Stephens; Peeples & Howell, for plaintiffs in error, submitted the following brief:

## I.

1. The resolutions organizing the Western and Atlantic Railroad committee, and defining its duties, did not empower

the committee to adjust the account of the superintendent; the first one is confined to the investigation of "frauds and embezzlements," etc., and the second one only authorizes the committee to adjust the accounts of "agents and other persons dealing with the road:" Acts 1871–2, pages 257, 329. (*a*) The terms, "agents and other persons dealing with the road," do not include the superintendent, because such is not the ordinary meaning of the language used: Code, sec. 4; and see Code, sec. 997; Acts 1858, p. 623; Acts 1871–2, p. 253. (*b*) And because the superior (superintendent) is not included in the inferior (agent:) 1 Blackstone's Com., 88; 5 Comyn's Digest, 328, 331. (*c*) And because, this being a proceeding in derogation of common right, every act making part of the system must be strictly construed: 31 Ga., 700, 710; Potter's Dwarris, 146; 18 Ga., 340; 7 Ga., 514, 515; 1 Brock., 520; 5 McLeon, 185; 2 Wh., 203; 4 Wh., 241; 10 Peters, 524, 525–6–7; 2 Dallas, 316; 4 Hill's N. Y., 76; 10 Modem, 283; 9 Bac. Abr., 250; 16 Ga., 111; 33 Ga., 612; 2 Brock., 448, 480, 484.

2. It was not in the power of the Legislature to organize a committee with authority to state an account against the superintendent for proceeds of iron at private sale, without advertisement. (*a*) Old iron must be advertised and sold at public outcry, and if note is taken, it must be deposited with the treasurer: Code, 1008, 1009. (*b*) Therefore, Blodgett, in selling iron at private sale, without advertisement, acted without authority, and was a *tort feaser;* to ascertain these facts and pronounce the judgment of law upon the same is a judicial question, and not a mere ministerial duty: 34 Ill., 362, 363; 2 Brock., 476, 480, 485, 486; 21 Wend., 218; 3 N. Y., 407; Cooly on Lim., 90, 91, 410. (*c*) But this legislative committee, not being of the judicial department, cannot perform any judicial function; it can only perform ministerial acts: Code, sec. 5106.

3. Again, if this legislative committee has power to adjust the superintendent's accounts, and compel payment of the same, it must proceed according to the usual modes unless

expressly authorized to resort to extraordinary remedies for reasons already given.

## II.

1. Is the account on which this execution issued the kind of a claim for which it was designed to use *the* process of the Comptroller General? It is not, for the following reasons: (*a*) It is not for "frauds of the road unaccounted for:" Code 907. (*b*) Nor is it for the "earnings of the road:" Code 1008–9. (*c*) Nor is it for moneys in the hands of a duly appointed financial agent of the road, or a designated depository of the funds of the road : 2 Brock, 480–484. (*d*) This process is designed to be used only against officers or agents of the kind above enumerated *for balances appearing in cash on the face of the books,* that can be stated by a mere ministerial officer or clerk: 2 Brock., 484; 5 Ga., 193; Code, 907, 911.

2. The law under which this execution pretends to proceed cannot be strictly pursued, and therefore the summary remedy cannot be used : Code 996 ; 9 Ga., 187.

3. But the Code does not give a summary remedy against the *sureties* of the superintendent *in any case.* When an execution issues summarily against a tax collector it issues also against his sureties; but when it issues against a tax receiver the sureties are not included. The section providing for a summary remedy against the superintendent, auditor, treasurer, etc., of the Western and Atlantic Railroad does not attempt to subject the sureties of these officers to the same process: Code 907, 911, 991; 2 Brock, 481–2; 21 Ga., 55, 56.

4. By the rule of strict construction we are forced to adopt interpretation of the statute which would restrict rather than extend the language used.

5. But if this kind of remedy was ever authorized against the superintendent and his sureties, it cannot be employed now, because recent legislation was intended to substitute new modes of proceeding entirely: Acts 1871–2; pages 72, 77, 253, 256–7, 329. If this was not the legislative purpose,

Scofield *et al. vs.* Perkerson *et al.*

these recent Acts show that the Legislature considered the summary execution inapplicable to any but plain accounts.

## III.

Have complainants the right to resist this summary remedy by illegality or bill? They have for the following reasons:

1. This is not a claim for taxes, nor in the nature of such a claim (nor for funds in the hands of a duly appointed financial agent.)· The defense is not denied by the Code, section 3618.

2. Section 914 of the Code does not attempt to deny the right of judicial interference to any execution except those issued under sections 907 and 911. So that if section 991 or any other law really authorizes this summary remedy against the superintendent and his sureties, it does not undertake to deny the usual defense given by law in other cases against executions issuing or proceeding illegally: Code 914, 907, 911, 915, 991; 3 Mason, 331.

3. But if the law did undertake to deny complainants a hearing in this case before a sale of their property, it would be unconstitutional, because: (*a*) "No person shall be deprived of life, liberty or property, except by due process of law:" Code 5078; Cooly on Lim., 353; 4 Wh., 244; 1 Kent's Com., 620–1, note; Sedgwick on C. and L. L., 537–8–9. (*b*) "The right of trial by jury, *except where it is otherwise provided in the Constitution,* shall remain inviolate:" Code 5207, 5174; 5 Ga., 193. (*c*) "Legislative Acts in violation of this Constitution, or the Constitution of the United States, are void, and the judiciary shall so declare them:" Code 5107; 27 Ga., 357–8; 42 Ga., 424, 428.

4. Even in cases of distress for taxes the Courts always had the right to interfere, unless, (*a*) The proceeding was *under the Act of* 1804, *or under the Code:* Code 3618; 27 Ga., 357; 42 Ga., 428; (*b*) and for taxes exclusively; same authorities and Cooly on Lim., 487–89, 490; (*c*) and under a law authorizing the proceeding; 27 Ga., 357–8; 42 Ga., 428·

Conclusions.    The Court below should have granted the injunction if either of the following positions is true:

1. If the legislative committee either were not or could not be authorized to adjudicate a claim like the one in question.

2. Or if the statute did not originally authorize this summary remedy against the sureties of a superintendent, or if the law to that effect has been repealed.

3. Or if the right of trial by jury either has not been, or could not be, denied by the Legislature in a case like this.

N. J. HAMMOND, Attorney General; J. T. GLENN, Solicitor General, for defendants, argued as follows:

Bonds of superintendent and treasurer of Western and Atlantic Railroad are deposited with Comptroller General: R. Code, secs. 973, 984.

The Comptroller must "audit the accounts of all agents disbursing public money:" R. Code, sec. 94, p. 13; and "collect all evidences of debt due to the State from any other source than taxes:" R. Code, sec. 94, p. 9. His means of collection is a *fi. fa.:* Sec. 94, p. 6 and 8; sec. 911 (T. C.) and 991, (W. & A. R. R.)

Distress was *common law* remedy for a "debt due to the Crown:" Black. Com., 14; Bacon's Abridg.; Distress G., Comyn's Dig.; Distress, (D. 7.)    Recognized by sec. 4 of Act of 1823: Cobb's N. Dig., 1025.

The revenue of the State comes from the Western and Atlantic Railroad earnings: Code, sec. 994, p. 1; and from "the use by individuals of any other property of the State:" Sec. 94, p. 5.    Revenue defined: Yancey *vs.* The N. M. Manuf'g Co., 33 Ga. R., 624.    Revenue from the Western and Atlantic Railroad put on footing with taxes: The State *vs.* Dixon, 38 Ga. R., 171.

There can be no judicial interference with the collection of the public revenue.    No replevin "for goods seized for a debt to the king, without command of the king, or of the Barons of the Exchequer:" 7 Comyn's Dig., Replevin D.    It was prohibited where county fund ("public fund") was in hands

Scofield *et al. vs.* Perkerson *et al.*

of Judge of Inferior Court: Tift *et al. vs.* Griffin, (Act 1796,) 5 Ga. R., 188, 189, 192; Eve *vs.* The State, 21 Ga. R., 50, 51, 58, 59; (Act of 1804,) *fi. fa.* by Comptroller *vs.* T. C. securities.

Yancey *vs.* The N. M. Manuf'g Co., 33 Ga. R., 622, tax for indigent widows and orphans of soldiers: R. Code, secs. 991, 914, 3618; see, also, 27 Ga. R., 354; 40th, 133; 42d, 424, 428. Tax receiver's liability: Sec. 907, 922, 913, 914, 915, 916, 943.

The construction of section 991, etc., Revised Code, should be controlled by the Act of 1858, of which they are the codification: See Acts of 1858; R. Code, secs. 914, 3618.

By that Act the construction is "liberal," and so it has ever been to effect the object of collecting public revenue. In Doe, *ex dem.*, Gledney *et al. vs.* Deavors, 11 Ga. R., 84–5, "distress," in Act of 1804, construed to mean "*execution.*"

In Eve *vs.* The State, 21 Georgia Reports, 50, see the construction. The 16th and 24th sections of the Act of 1804 authorized the *Treasurer* of the State to issue *fi. fa.* against tax collectors: Cobb's Dig., 1052. The Comptroller General was held competent to issue this *fi. fa.* by *considering* the 3d section of the Act of 1823, (Cobb's N. Dig., 1025,) as amending said section of Act of 1804. The 24th section of Act of 1804 authorized *fi. fa.* against *collector*, but was *held* to cover his securities also by *construction*: Eve *vs.* The State, 21 Ga. R., 50. The Act of 1804 forbade judicial interference with taxes levied under *that Act.* By *construction*, it has been applied to all subsequent tax Acts; summary remedy is a necessity: Tift *et al. vs.* Griffin, 5 Ga. R., 190, 191; Doe, *ex dem.*, Gledney *vs.* Deavors, 8 Ga. R., 484; 11 Ga. R., 81–2; Yancey *vs.* The N. Manuf'g Co., 33 Ga. R., 623. Can the judiciary interfere with the collection of taxes levied since the Code, because the Code only forbids interference with "taxes under the provisions of this Code:" Sec. 3618; see 27 Ga., 359; 11 Ga. R., 219.

It is not unconstitutional to allow this summary remedy without a judgment. It was without jury before Constitu-

tion of 1798: Tift *vs.* Griffin, 5 Ga. R., 189–190. So it has ever been. The new Constitution, Art. 5, sec. 13, p. 1, says—" The right of trial by jury \* \* \* shall *remain* inviolate:" 33 Ga., 622; 21 *Ibid.*, 50.

The officers of the Western and Atlantic Railroad being abolished by Act of 1871, it was the Comptroller's duty to collect all dues to it. See citations *ante.* His mode of collection is by *fi. fa.* In issuing that he acts *ministerially* only: 5 Ga. R., 193, Tift *vs.* Griffin; 11 Ga. R., 217; Bassett *vs.* the Governor, 29th, 157; Justices Inferior Court *vs.* Hunt *et al.*

However, he finds out the fact that a public officer is a defaulter, the Comptroller must issue *fi. fa.* The resolutions appointing the committee on the Western and Atlantic Railroad make them, in lieu of the superintendent, the proper authority to audit accounts and " compel settlements." See Acts of 1871-'72, 257 and 329 Rev. Code, sec. 975, pts. 7, 11, 15.

The State *directly* has no other remedy; she cannot wait slow process of suit. She may use all remedies; they are but cumulative: Doe *ex dem.*, Gledney *vs.* Deavors, 8 Ga. R., 483.

MONTGOMERY, Judge.

1. On December 14th, 1871, the Legislature abolished the offices of the Western and Atlantic Railroad. Before their abolition, as soon as an agent or any other person having funds of the road unaccounted for was in default, and failed to pay over said funds on demand, made by the superintendent or by his authority, or absconded, or concealed himself, or in any other way evaded or prevented a settlement, it became the duty of the superintendent promptly to cause the true amount due by such person to be ascertained, and transmit the same to the Comptroller General as earnings of the road, stating also the date of the default: Code, sec. 996. The duty of the Comptroller General is then pointed out by section 991. He

Scofield *et al. vs.* Perkerson *et al.*

is to issue execution against the defaulter and his sureties, as in case of a defaulting tax collector, etc. It will be perceived by an examination of the sections referred to, and others upon the same subject-matter, that there is no provision made for a report to the Comptroller General of any default by the superintendent himself, and yet section 991 makes it the duty of the Comptroller General to issue execution against the superintendent and his sureties in case of his default, as he must do against any inferior defaulting officer upon report made by the superintendent. Where a duty is imposed upon an officer to be performed upon the happening of a contingency, and no mode is pointed out whereby he is to be officially informed that the contingency has happened, it necessarily is a part of the duty required of him to ascertain the happening of the contingency for himself. Hence, before the Act abolishing the offices of the Western and Atlantic Railroad, upon default made by the superintendent, it became the duty of the Comptroller General to ascertain the amount for which he was a defaulter and issue execution therefor. The abolition of the office of superintendent extended this duty of the Comptroller to all defaulting officers of the road. This being his duty, and no custodian of the books of the road being specially provided by law, they naturally fell into his hands, where all other revenue accounts due to the State are kept : Code sec. 94, p. 9, sec. 95, p. 6.

2. It is insisted that the Legislature had no authority to constitute a committee of their own body a Court to try and determine *ex parte* the liability of the principal of the complainants, and to cause execution to issue against said principal and his sureties. Conceding this to be true, it is clearly competent for the Legislature to appoint a committee of their body as ministerial agents to audit and state the accounts of the officers of the Western and Atlantic Railroad, and to report the result of their investigations to the Legislature.

When they do this, and the committee proceed with the investigation and ascertain to their own satisfaction that there has been default, while it may be true that they have

no power to compel the Comptroller General to issue execution for the amount found to be due by the defaulting officer, yet if they transmit the result of their investigations to the Comptroller General, and he chooses to adopt it as his own after verifying it by the books of the Western and Atlantic Railroad, he does exactly what he is by law required to do, in issuing the execution against the officers found in default and his sureties. For aught that appears, that is what has been done in this case, and the Courts will not presume any irregularity where the case made does not show any to exist. The jurisdiction of person and subject matter by the Comptroller General cannot be seriously questioned: Acts of 1858; Code 991, 911, 907, 943.

If then the Comptroller acted within his jurisdiction, as set forth in the legislative Acts referred to, there can be no judicial interference : Code, 3618, 914. The appeal is to the Governor: *Ibid.,* 914. But it is said the surety is deprived of his constitutional right to trial by jury. The Constitution only provides that the trial by jury shall " remain inviolate;" *i. e.,* remain as it existed before the adoption of the Constitution. As early as December 22d, 1791, it was enacted that " no replevin shall lie, or other judicial interference be had in any levy or distrain for taxes under this law, but that the party injured be left to his proper remedy in a Court of law:" Mar. and Crawford's Dig. 497. And the same Act for the first time provides for the issuing of execution by the Treasurer (now Comptroller General) against defaulting tax collectors *and their sureties.* These provisions have been retained upon the statute book from that day to this. What was the proximate cause of a denial of judicial interference has been lost by the lapse of time. The sureties of officers against whom these summary remedies are provided must be held to have contracted in reference to the law. Hence, this claim to a right to trial by jury cannot avail them.

Thus far I have considered the case made by the record. The case made in the argument was a very different one. It

is said that the books of the Western and Atlantic Railroad do not show the balances against the superintendent and treasurer for which the executions are issued by the Comptroller General; that the amounts were arrived at by an *ex parte* examination of witnesses, without any opportunity to the parties whose interests are affected *to* cross-examine *or to* offer counter-evidence.   If the record made this case, I (speaking for myself) should have serious difficulty in assenting to an affirmance of the judgment.   This Court has decided that the Comptroller General in issuing executions of the character of those under consideration *acts ministerially* only : *Tift et al., vs. Griffin,* 5 *Ga.,* 185.   The Court say he "has no judicial functions in this regard.   There is no issue to try, there is no judgment to be pronounced.   As *auditors*— and the Court underscore the word—it is their business to ascertain the amount due, and then to issue execution."

If the statement in the argument of the case at bar be true, the action of the committee, or the Comptroller, has been very like a judicial act.   To permit these summary proceedings in contested cases would be to place in the hands of the Comptroller General a very oppressive engine.   It at once transforms him into a judicial officer, with power to hear *ex parte* accusations against any financial agent of the State and his sureties, and to pronounce a judgment from which there is no relief except in the clemency of the Governor and an Act of the Legislature.   Chief Justice Marshall has well said, in discussing a similar revenue law of the United States, "I will not attempt to detail the severities and the oppression which may follow in the train of this law, if executed in contested cases.   They have been brought into full view by counsel in their arguments, and I will not again present them.   It may be said with confidence that the Legislature has not passed any Act which ought, in its construction, to be more strictly confined to its letter :" *ex parte* Randolph, 2 Brock., 480.   Again, he says in the same case, " If we take into consideration the character and operation of the Act, the extreme severity of its provisions, that it departs

entirely from the ordinary course of judicial proceeding and prescibes an extreme remedy, which is placed under the absolute control of a mere ministerial officer, that in such a case the ancient established rule is in favor of a strict construction ; my own judgment is satisfied that this is the true construction."

Let it be borne in mind, that—again to paraphrase Judge Marshall—it is not the responsibility of these complainants to the State, but their liability to this particular process, which is the subject of inquiry. The Legislature might very reasonably make a distinction, when giving this summary process, between an officer, whose whole liability ought to appear on the books of the Western and Atlantic Railroad, and an agent, whose liability is to be ascertained by extrinsic evidence. " But it is enough for me," adds Judge Marshall, " that the law, in my judgment, makes the distinction :" *Ibid.,* 484. In interpreting the language of the Act, Judge Marshall says : " The second section of the Act requires that the account stated by order of the first Comptroller of the treasury 'shall exhibit *truly* the amount due to the United States.' For what purpose was the word *truly* introduced ? Surely not to prohibit the officers of the government from exhibiting an account known to be erroneous. Congress could not suspect such an atrocity. Its introduction, then, indicates the idea that this summary process was to be used only when the true amount was certainly known to the department; when the sum of money debited to the officer appeared certain, and either no credits were claimed, or none about which a controversy existed,"—note the similarity of our Code—" said officer (superintendent) shall promptly cause the *true* amount due by such person to be *ascertained,* and transmit the same to the Comptroller General," etc. How ascertained ? By the examination of witnesses *ex parte ?* I think not. An examination of the duties of the Comptroller General, as set forth in the Code, will, I think, sustain this position. See the Code, from section 92 to 105, both inclusive. Among other things, he is to report, annually, to the Governor, "a

statement of the accounts of all officers and agents disbursing public money  *   *   *   and the several sums for which they are in default." How is he to ascertain how much they are in default? By summoning witnesses and subjecting them to an *ex parte* examination? What form of subpœna would he issue to compel their appearance, and what punishment inflict for disobedience to the writ? What officer would serve hĭs processes, and execute his orders of punishment for contempt? What oath would he administer to the witnesses, and how could they be found guilty of perjury if they swore falsely? At best, they could only be convicted of false swearing, and if so convicted, what redress has the victim. Section 4400 of the Code applies only to perjury. Surely the Comptroller General cannot go beyond the proper books of account to ascertain how much is due by a defaulting officer, in order to issue his summary process against him to collect the amount.

I am more inclined to think this is a correct interpretation of the law, from the fact that the denial of judicial interference is an anomaly known only, so far as I have been able to ascertain, to the law of our own State. Certainly it has no warrant in the common law. By the law of England, an extent (or execution) issued in a summary manner against a defaulting fiscal agent of the crown, but he could always invoke the protection of the Court of Exchequer to try before a jury the truth of his alleged indebtment, if he denied it. Mr. Tidd, in his work on practice, (2d volume, 1072–3,) says: "Having shown the different modes of proceeding for the recovery of debts at the instance or for the benefit of the crown or its debtor, it will next be proper to state the means of resisting such proceedings, either by the defendant or a third person. These means are first by motion or application to the Court to set aside the extent and proceedings under it, or for other purposes; secondly, by petition of right; thirdly, by *monstrans de droit;* fourthly, by traverse of office; and fifthly, by demurrer. Motions to set aside extents are of two kinds: first, on account of some defect apparent on the face

of the proceedings; and secondly, on the ground of some objection which does not appear thereon, but must be verified by affidavit. * * * If the motion be decided against the claimant, *he may still plead.* * * * Pleas to extents are either by the defendant, or party against whom the extents issued, or by third persons; and they are of two kinds: first, pleas which go in denial or discharge of the debt, and which can be pleaded only by the defendant, or those claiming under him; and secondly, pleas which do not go to the denial or discharge of the debt, but are pleaded to the extent by third persons, who claim the goods, etc., which have been seized as the defendant's, and which pleas go to the property of the goods, etc., seized under the extent:" 2 Tidd's Pr., 1077. In other words, to use our own legal parlance, the defendant may file an affidavit of illegality, or a third person may put in a claim. If the defendant pleads he is not indebted, "he may give in evidence any matter in denial or discharge of the debt:" *Ibid.*

It is true there could be no replevin of the property seized by the levying officer, but that is a very different matter from allowing the party to come in and put in a defense if he had any; in a word, to invoke judicial interference. This was always allowed, and in cases where it was sought to charge the sureties upon the bond of a fiscal agent the practice was to issue a *scire facias*, calling upon them to show cause why an extent should not issue: Foster's Writ of *Scire Facias*, 330, (73 vol. Law Lib.) And even as against the principal a *scire facias* issued unless an affidavit of danger of loss of the debt was made on behalf of the crown: *Ibid.*, 335; see Bingham on Executions, 228 (13 L. L.) Notwithstanding all these delays in the collection of the British revenue, and which have existed time out of mind, we hear of no serious detriment to the English government arising therefrom. Is not this the reason usually given for our statutory prohibition of judicial interference, that the State cannot afford to be delayed in the collection of her revenue more fanciful than

Scofield *et al. vs.* Perkerson *et al.*

real?   No great number of her fiscal against will be likely to become defaulters at once.

Inasmuch, then, as the prohibition of judicial interference seems to be peculiar to our own State, having no foundation in the common law and resting upon no reason satisfactory to my mind in the extended application which is asked for it, I am not disposed to go beyond what seems to me to be the intent of the Legislature, to-wit: that it should be confined to executions issued for the debts of fiscal officers as they appear from the books in which their accounts are kept.

It is true, that since the decision in this case was rendered in accordance with the views here thrown out, and then orally pronounced from the bench, the bills in these cases were amended and the allegation made that the executions issued were not founded on the book accounts of the Western and Atlantic Railroad, but on the *ex parte* testimony of witnesses and the cases again brought before this Court, at the present term, on demurrer to the bills—at which time I did not preside—and the Court held the executions properly issued. With due deference to the able Judges, who presided on that latter occasion, I cannot yield my convictions.

3. It only remains to add that if these executions were issued by the Comptroller General upon examination of the accounts of the principal of the complainants, as we must assume in the aspect in which the case presents itself before us, there can be no judicial interference for any reason, and therefore the reasons alleged for the interference are insufficient.

Judgment affirmed.