MAYO, sheriff, *vs.* RENFROE. MAYO, sheriff, *vs.* WILSON.

[This case was argued at the last term, and decision reserved.]

1. Where execution was issued by the governor of the state, and levied upon the property of the citizen by the sheriff of Washington county, and the legality of the process was attacked by bill for injunction filed against the sheriff, upon the ground that it was founded upon no valid constitutional law, the governor was neither a proper nor necessary party defendant thereto. The demurrer being filed for the sheriff by the attorney-general in his official capacity, the governor was represented in the litigation, for all practical purposes, by his legal adviser.

2. The relief prayed against the sheriff was substantial, and as he resided in the county of Washington, and the property levied on was located there, the superior court of that county had jurisdiction of the case.

3. The provision in the last section of the act of 1876, "to define the obligations pertaining to the office of treasurer," which allows to that officer and his sureties only those defenses as against executions issued under that act, now allowed tax collectors against *fi. fas* issued by the comptroller-general against them, does not refer by the use of the term "those defenses" to the appeal to the governor provided for in §912 of the Code, but to those which the courts had theretofore allowed tax collectors and tax-payers to make under the prohibition of judicial interference. Illustrative of exceptions to such prohibition may be stated the following:

(*a.*) An unconstitutional exaction, because what is then called a tax is no tax.

(*b.*) Where the law does not impose the tax or authorize the execution, for the same reason.

(*c.*) Where the defendants did not occupy the official positions alleged in the execution.

4. The bond of 1876 was never executed by the treasurer nor accepted by the governor, and though signed by the sureties, has no validity either as a statutory or common law bond. The act of 1876 did not contemplate a summary execution to issue upon such an unexecuted paper, and to arrest such process the judiciary of the state must intervene.

5. The bond of 1877 was not executed within forty days from the election of the treasurer, was not recorded within the time prescribed by law in the office of the secretary of state, the sureties did not justify, nor was any affidavit of the sureties as to what they were worth attached to the bond and recorded therewith; therefore it cannot be said to be a statutory bond taken in accordance with the act of 1876, and the statutes in *pari materia*.

6. The meaning of §167 of the Code is to be gathered from the earlier decisions of this court, whence the codifiers drew it. These decisions ruled that official bonds were valid as common law bonds, though not executed in strict accordance with the statute, but that a recovery for the benefit of one person aggrieved, exhausted such instrument, and others were remediless. This section was to correct that evil, and gave remedies to all suitors successively until the penalty was exhausted. This summary remedy against the treasurer was not in the contemplation of that section, for it is the creation of the act of 1876, enacted long afterwards.

7. Whilst each surety, under the terms of the bond of 1877, was bound for a definite amount, yet each was nevertheless entitled to contribution from every other, and unless estopped by his own conduct, might, under the Act of 1876, claim his discharge from liability because the others had not been sworn as to their capacity to respond. The re uirement of the oath is not merely directory, but is of consequence primarily to the state, and secondarily to the sureties.

(*a.*) Possibly, a surety who did not himself qualify, and who signed with the knowledge that the others had not done so, would be estopped from setting up this defense, especially as it is recited in the bond that an oath was taken, though the oath itself is not attached as required by the statute.

8. The joint resolution of October 16th, 1879, under which the execu-

tions sought to be enjoined were issued, fixing the amount of the supposed liability of the treasurer and his securities, and requiring the governor to issue such process, for the amounts so fixed, is contrary to the provision of the constitution of 1868 and of 1877, which directs that, "No general law affecting private rights shall be varied in any particular case, by special legislation, except with the free consent, in writing, of all persons to be affected thereby." It appearing upon the face of the executions that they were issued under such resolution, it would seem that equity ought to interfere. If suspension of the executions by the governor and appeal to the legislature is the only redress of the treasurer and his sureties, the appellate power has taken the initiative and prejudged the case it was to try.

Injunction. Parties. Governor. State. Jurisdiction. Venue. Official bonds. Principal and surety. Tax Collectors. Judicial interference. Constitutional law. Before Judge SIMMONS. Washington County. At Chambers. June 5th, 1880.

On January 6th, 1880, Alfred H. Colquitt, as governor of Georgia, issued two executions against John W. Renfroe, treasurer of the state, and the securities on his official bonds, as follows:

"EXECUTIVE DEPARTMENT,
STATE OF GEORGIA,                                January 6th, 1880.
                                                Atlanta, Georgia.
    "Fulton County.

    "*To all and singular the Sheriffs of this State:*

    " WHEREAS, John W. Renfroe executed his official bond as Treasurer of this State with sureties, as required by law, in words and figures as follows, to-wit:

    "State of Georgia—Know all men by these presents, that we, John W. Renfroe, as principal, and     *     *     *     as securities, are held and firmly bound unto his Excellency, James M. Smith, Governor, etc., and his successors in office, in the just and full sums following, to-wit: the said principal in the sum of two hundred thousand dollars, and each of said securities in the sum opposite to his name; that is to say: John M. Stubbs, in the sum of $8,000.00; T. Christian, in the sum of $5,000.00, etc., etc., etc. For the true payment of which

sums respectively we bind ourselves jointly and severally, and each and every one of our heirs, executors and administrators, firmly by these presents, sealed with our seals and signed by us, and dated this the ——day of ——, 1876.

The condition of the above bond is as follows : Whereas, the above bound John W. Renfroe was, on the ——day of January, 1876, elected by the General Assembly of this State Treasurer of Georgia, to fill the vacancy in said office occasioned by the removal of John Jones, Esq.: Now, if the said John W. Renfroe shall faithfully discharge, execute and perform all and singular the duties of him required, and which may be required, by the constitution and laws, and will faithfully account for and pay over all moneys that may be received by him from time to time by virtue of his office, and will safely deliver to his successor all books, moneys, vouchers, accounts and effects whatsoever belonging to his said office, then the above obligation shall be null and void, otherwise to remain of full force and virtue.

And further, the securities each for himself, on oath says, that he is *bona fide* worth, over and above his debts, exemptions and liabilities of all kinds, property in realty and personalty not less than the sum placed opposite his name herein.

Signed, sealed and delivered         (No signature of Renfroe.)
   in presence of         (The rames of thirteen securities
      JAMES M. GOLDSMITH,   signed by   J. B. CAMPBELL,
   *Notary Public Fulton County.*         *Attorney, etc.*)

      E. A. SULLIVAN,
   *N. P. & ex-of. J. P. W. C.*   (The signatures of nine securities.)

J. M. Goldsmith signed, sealed
   and delivered in presence of
      W. T. NEWMAN,         JAMES M. GOLDSMITH, [L.S.]
   *N. P. Fulton County.*

" And whereas, the General Assembly of this State, by resolution approved October 16th, 1879, made it the duty of the Executive to issue a *fi. fa.* against the said John W. Renfroe and his sureties, on said bond, for certain sums of money received and appropriated by said Treasurer and certain of said sureties to his own and their own private use, contrary to law.

" And whereas, said John W. Renfroe, Treasurer as aforesaid, received and appropriated to his own private use at divers times, between and including the nineteenth day of January, 1876, and the first day of March, 1877, the sum of $3,086.56. And whereas, said John W. Renfroe, Treasurer as aforesaid, has allowed one Benjamin J. Wilson, at divers times between and including the tenth day of March, 1876,

v 66—26

and the tenth day of January, 1877, to receive and appropriate to his own private use the sum of $975.00. (The *fi. fa.* here proceeds to charge in the same manner the appropriation of money by other securities.) Said sums amounting in the aggregate to the sum of $5,037.81, all of which said sums were received as interest and commissions for the use of the public funds of this State.

"Now, therefore I, Alfred H. Colquitt, Governor of this State, do command you, that of the goods and chattels, lands and tenements of said John W. Renfroe, principal, of said county, and of the goods and chattels, lands and tenements of the following sureties on the official bond of said Treasurer, to-wit: Jno. M. Stubbs, of the county of Laurens, * * * * you cause to be made the sum of $5,037.81, principal, and $1,103.86, interest, with interest from this date on said principal sum to the date of payment of the same, and also the further sum of $1,000.00 as penalties, and ———— dollars cost. *Provided:* that of said sums you do not recover of said John M. Stubbs more than the sum of $8,000.00, nor of (here follow the names of certain other sureties limiting the recovery to the amount for which each of them agreed to be liable on the face of the bond). And that you pay over said sums of money to me, as Governor of said State, for the use of said State, at the Capitol, in said city of Atlanta, so soon as the same can be made by law, and have you then and there this *fi. fa.* with all your actings and doings by virtue of the same entered thereon.

"Given under my hand and the seal of the Executive Department, at the Capitol, in Atlanta, on this the day and year first above written.

By the Governor.

(Signed)          ALFRED H. COLQUITT,

[L.S.]                               *Governor."*

The second execution was dated and commenced as the preceding; it then proceeded as follows:

"Whereas, John W. Renfroe executed his official bond as Treasurer of the State, with sureties as required by law, on the 3d of March, 1877, and whereas, the General Assembly of the State, by resolution, approved October 16th, 1879, made it the duty of the Executive to issue a *fi. fa.* against said John W. Renfroe and his sureties on said bond for certain sums of money received and appropriated by said Treasurer and certain of his said sureties to his and their own private use contrary to law; and, whereas, said John W. Renfroe, Treasurer as aforesaid, received and appropriated to his own private use, at divers times between and including the 3d of April, 1877, and the 6th of November, 1878, the sum of $9,855.19; and, whereas, said John W. Renfroe, Treasurer as aforesaid, has allowed one John W. Murphy,

at divers times between and including the 1st of May, 1877, and the 6th of November, 1878, to receive and appropriate to his own private use the sum of $4,876.09,    *   *   *   *   said sums amounting in the aggregate to the sum of $17,761.00, all of which said sums were received as interest and commissions for the use of the public funds of this State.

"Now, therefore, I, Alfred H. Colquitt, Governor of this State, do command you that of the goods and chattels, lands and tenements of said John W. Renfroe, principal, of said county, and of the goods and chattels, lands and tenements of the following sureties on the official bond of said Treasurer, to-wit:   Thomas J. Smith, of the county of Washington,   *   *   *·  you cause to be made the sum of $17,761.49 principal, and $2,257.46 interest, with interest from this date on said principal sum to the date of payment of the same, and also the further sum of $2,000.00 as penalties and ―― dollars cost.   Provided, that of said sums you do not recover of said Thomas J. Smith more than the sum of $10,000.00."   (Here follows the name of each surety, limiting the amount of recovery against him to his liability as stated on the face of the bond.)

The execution then concludes as did the first.

On January 13th, 1880, these executions were levied on real estate in the county of Washington, the property of Renfroe and of Wilson, one of his sureties.

Wilson filed his bill against the sheriff of Washington county to enjoin the sale of his property under the levies, and any further proceeding on the *fi. fas.*   The grounds upon which such relief was asked, as against the first execution, were, in brief,.as follows:

1. That said *fi. fa.* appears on its face to have been· based on the resolution of the general assembly, approved October 16th, 1879, (see pp. 431 and 432 Acts 1878–'79) and not on the independent action of the governor, after investigation by him as to the amount due, etc., showing that the legislature fixed the amount for which it should issue, and not the governor.   It is recited, in connection with this ground, that complainant, Wilson, signed· the bond, supposing that it had been executed by Renfroe, or on condition that it would be, which in fact was not done.

2. That, by reference to the copy of the bond contained in the execution, it is manifest that no breach of its condition is set forth.

3. That the governor has never ascertained by investigation that said Renfroe has been guilty of any breach of his bond, but has based his action, in issuing said *fi. fa.*, on the investigation had by the general assembly and the resolution aforesaid; complainant alleging that the whole proceeding was illegal and unjust, and could have been so proved if opportunity had been given.

4. That Renfroe himself did not in fact execute said bond, and it is not, therefore, the official bond prescribed by act of February 25th, 1876, and the remedy provided by said act does not apply, and cannot be invoked, to enforce any supposed liability thereunder; complainant alleging that he contracted as surety only, and that his liability is secondary and not primary.

5 That said bond bears no date, and said *fi. fa.* does not show when it was executed by any of the sureties, and it does not appear that it was executed after the passage of the act of February 25th, 1876, which alone gives the summary remedy by execution sought to be used in this case.

6. That, as said *fi. fa.* does not show when said bond was executed—what day in the year 1876—it is impossible to ascertain the amounts of interest and commissions received by Renfroe, complainant or other sureties whilst said bond was of force, and it is, therefore, manifest that said *fi. fa.* was issued for an arbitrary and unascertained amount, and is illegal.

7. That Renfroe was never qualified and commissioned as treasurer under the election held January 13th, 1876 and never executed any bond as treasurer under said election, and said bond was never accepted or approved by the governor, and is not, therefore, the bond prescribed by the act of February, 1876, or any other law, and the remedy provided by said act is not applicable; that Ren-

froe. was appointed on the 4th of December, 1875, as treasurer, in place of John Jones, gave the bond required by law, entered on his duties, and continued to hold under said appointment until his election, January 13th, 1876; that the governor, refusing to approve the bond then tendered by said Renfroe, allowed him to hold the said office under said original appointment and bond until the expiration of Jones' term, to-wit; January 12, 1877; that the bond on which said *fi. fa.* is based was never recognized in any way by the executive as that under which Renfroe was discharging his duties as treasurer during governor Smith's term, which ended January 12th, 1877, nor was it so recognized by the present governor until said *fi. fa.* was issued. For these reasons it is claimed that said bond is not the one prescribed by the act of 1876, and the remedy provided thereby is inapplicable.

8. That the bond in question was not filed in the executive office within forty days after the election of said Renfroe on January 13th, 1876, as required by section 154 of the Code.

9. That if said bond was executed after the act of February, 1876, it fails to conform to said act in the following particulars: First, it is not signed by the treasurer; second, each surety did not make oath as to his being worth the amount, etc., for which he became bound; third, said bond was not approved by the governor, and could not have been unless the sureties justified, etc.; fourth, said bond was not recorded in secretary of state's office until August 23d, 1879, long after the term for which Renfroe had been elected had expired, and whilst he was serving under an election had January 16th, 1879, and long after the interest and commissions for the use of the public funds are alleged in said *fi. fa.* to have been received by said Renfroe and his sureties, and said bond could not have been recorded because not " duly executed and approved;" fifth, the names of several of the sureties (other than complainant) were signed to said bond by J. B.

Campbell, as attorney, under a power claimed to be void under section 153 of the Code, because not attested by the ordinary, and the names of said sureties being signed without authority, they could not have made the oath prescribed by the act of 1876.

10. That said Renfroe was not treasurer under the election of January 13th, 1876, because he did not qualify; was not commissioned, and did not execute the requisite bond; hence the remedy provided by act of 1876 does not apply.

11. That none of the grounds prescribed in the 14th section of the act of February 25th, 1876, on which execution may issue, existed when said *fi. fa.* was issued.

12. Same in substance as the 11th.

13. That it is not true that the several sums of money specified in said *fi. fa.* were received and appropriated by said Renfroe and his sureties during the times stated in said *fi. fa.*

14. That said Renfroe has not used himself, nor allowed his sureties, or other persons, to use the funds of the state in his hands, and if the *fi. fa.* was issued to enforce any such supposed liability, it is illegal, because the 8th paragraph of section 92 of the Code, re-enacted in the act of February, 1876, prescribes that if the public funds are so used, the treasurer shall incur a penalty of $500, or a forfeiture of his salary, if said forfeiture will pay the penalty; and said *fi. fa.* should have been for said penalties, and not for commissions and interest; whereas, the governor has never stopped the treasurer's salary, but has regularly caused the same to be paid.

15. That to authorize a *fi. fa.* for commissions and interest received "between and including January 17th, 1876, and March 1st, 1877," the bond should have been executed prior to the act of February 25th, 1876—said act cannot retroact, and thus deprive Renfroe and his sureties of trial by jury, and the other safeguards and means of protection given them by law.

## FEBRUARY TERM, 1881. 417

Mayo, sheriff, vs. Renfroe—Mayo, sheriff, vs. Wilson.

16. That the form of said bond and the facts of the case demonstrate that it was executed in 1876, after the passage of the act of February 25th, and it cannot cover any breach of trust prior to its date.

17. That said act of February 25th, 1876, so far as it authorizes a summary execution, is in violation of paragraph 1, section 13, article 5 of the constitution of 1868, and of paragraph 1, section 18, article 6, of that of 1877.

18. That said act is violative also of paragraph 3, article 1 of the constitutions of 1868 and 1877.

19. That said act is also violative of paragraph 5, article 1 of the constitution of 1868, and of paragraph 4, article 1 of that of 1877.

The grounds on which the second execution was sought to be enjoined are—

1. That said *fi. fa.* appears on its face to have been based on the said resolution of the general assembly, approved October 16th, 1879, and not on the independent action of the governor, etc.

2. That by reference to the bond on which it is founded, it is manifest that no breach of the condition of said bond is set forth in said execution.

3. That the governor has never ascertained, by investigation, that said Renfroe has been guilty of any breach of his bond, but has based his action on the investigation had by the general assembly.

4. That the bond on which said execution is based is not the bond prescribed by the act approved February 25th, 1876, in this, that one of the conditions of the bond required by that act is, that " he (the treasurer) will faithfully account for and pay over all moneys that may be received by him from time to time by virtue of his office," whilst the condition of the bond on which this execution is issued, is to "faithfully account for and pay over all moneys that may be received of him from time to time, by virtue of his office."

5. That said bond was not filed in the executive office

within forty days after the election of said Renfroe, as treasurer, on January 16th, 1877.

6. That none of the grounds prescribed in the 14th section of the act of February 25th, 1876, on which execution may issue, existed when said *fi. fa.* was issued.

7. Same, in substance, as the 6th.

8. That it is not true that Renfroe, " treasurer as aforesaid, received and appropriated to his own private use, at divers times between and including the 3d of April, 1877, and the 6th of November, 1878, the sum of $9,855.19," nor is it true that he allowed Murphy or Tommey to appropriate the sums alleged in said *fi. fa.* to have been applied to their use during said period.

9. That said Renfroe has not, since he has been treasurer, used himself, nor allowed his sureties, or other persons, to use the funds of the state in his hands, and if said execution was issued to enforce any liability supposed thus to have been incurred, it is illegal, because the said act of February 25th, 1876, itself prescribes that for every such violation of duty the " treasurer shall be liable to the state for the sum of $500 as a penalty, or a forfeiture of his salary, if said forfeiture will pay the penalty incurred," whilst this execution includes the interest and commissions alleged to have been received for the use of the public funds in the hands of the treasurer, with interest calculated thereon, as well as the penalties alleged to have been incurred. Renfroe's salary was never stopped, but the governor continued to issue his warrants therefor, thus failing to decrease the amount for which the sureties would be liable on said bond, if liable at all.

10. That said bond on which said *fi. fa.* is based does not comply with the substantial requirements of the act of February 25th, 1876, in the following particulars: First, said bond is not conditioned, as required by said act, as shown in the fourth ground; second, each surety did not make oath that he was *bona fide* worth over and above exemptions, etc.. property amounting to the sum

specified in said oath; third, said bond was not approved by the governor, and could not have been, unless the sureties had taken the prescribed oath, and the governor should be satisfied of the responsibility of each surety; fourth, said bond was not filed in the executive office within forty days after the aforesaid election of said Renfroe, as required by section 154 of the Code; fifth, said bond was not recorded in the secretary of state's office until August 22d, 1879, when the time therefor had expired, and long after said interests and commissions are alleged to have been received, and could not have been legally recorded at all, because not "duly executed and approved." Therefore, it is claimed that said bond is not the official bond prescribed by said act, and the summary remedy it provides is not applicable.

11. That said act of February, 1876, under which said *fi. fa.* was issued, so far as it authorizes a summary execution against the treasurer and his sureties, and allows them such defenses only as were then allowed tax collectors to executions issued by the comptroller-general against them, is violative of the clauses of the constitutions of 1868 and 1877, heretofore specified.

The bill alleges that both of said *fi. fas* have been also levied by the defendant, Mayo, on property of said Renfroe; and that said Renfroe tendered to said Mayo affidavits of illegality, setting forth substantially the same grounds herein set forth, and that said Mayo refused to receive the same, stating that he was of opinion that he was unauthorized to accept affidavits of illegality, no matter on what grounds based, and that he would proceed to sell under the levies made, unless restrained by the order of the chancellor. The bill further alleges that if the said sheriff proceeds to advertise the property levied on, irreparable injury will be done to the said Renfroe and his sureties. It also alleges that said *fi. fas* were issued in pursuance of a joint resolution passed by the general assembly on the report of a committee of that body, ap-

pointed to investigate the affairs of the treasury department; that they were not issued on account of facts ascertained by the governor after investigation by him; that Renfroe was not allowed to appear before said committee except as a witness, nor to be represented by counsel; that said committee held secret sessions, and that Renfroe has had no hearing, and that his property, and that of his sureties, has been seized under executions based on no judgment, and without investigation by any proper tribunal.   The bill prays both a temporary and a perpetual injunction.

Attached to the bill, among other exhibits, was a copy of the bond of 1877, as follows :

"STATE OF GEORGIA.

"Know all men by these presents that we, John W. Renfroe, as principal, and T. J. Smith,   *   *,    as securities, are held and firmly bound unto his Excellency, Alfred H. Colquitt, Governor, etc., and to his successors in office, in the just and full sums, the following, towit : The said principal, in the sum of $200,000.00, and each of said securities in the sum opposite to his name, that is to say :

   " T. J. Smith, in the sum of ten thousand dollars.
   *     *     *     *     *     *     *     *     *     *     *     *

   " For the true payment of which sums respectively we bind ourselves jointly and severally, and each and every one of our heirs, executors and administrators, firmly by these presents, sealed with our seals, and signed by us, and dated this third day of March, 1877.

   " The condition of the bond is as follows :

   " Whereas, the above bound John W. Renfroe was, on the sixteenth day of January, 1877, elected by the general assembly of this state Treasurer of Georgia : Now if the said John W. Renfroe shall faithfully discharge, execute and perform all and singular the duties of him required, and which may be required by the constitution and laws, and will faithfully account for and pay over all moneys *that may be received of him* from time to time by virtue of his office, and will safely deliver to his successor all books, moneys, vouchers, accounts and effects whatsoever, belonging to his said office, then the above obligation shall be null and void, otherwise to remain of full force and virtue.   And further, the securities, each for himself, on oath, says that he is *bona fide* worth, over and above his debts, exemptions and liabilities of all kinds,

property in realty and personalty not less than the sum placed opposite. his name herein.

"Signed, sealed and delivered in the presence of:

"James M. Goldsmith, *Not. Pub.*, Fulton co,, Ga., witnessed the signature of the first seven names to this bond, and J. W. Renfroe as principal.

"J. M. Goldsmith and J. W. Murphy signed in my presence.

"W. T. NEWMAN,
"*Not. Pub., Fulton co., Ga.*
"March 10, 1877..

"The names from A.J. Haines to H. N. Hollifield, inclusive, signed in my presence.

"E. A. SULLIVAN,
"*N. P. & ex-of. J. P., W. C.*

"March 10, 1877.

"F. R. Greiner signed in my presence.

"CLEMENT C. BROWN,
"*Ordinary W. C.*

J. W. RENFROE. [L. S.]

(Here follow the names of all the sureties.)

"Recorded in book 'Miscellaneous Records,' pages 416 and 417, August 22, 1879.

J. T. JONES,
"*Clerk in Secretary of State's office.*"

Renfroe also filed his bill against said sheriff, containing substantially the same allegations, and praying that any further proceedings on the executions be enjoined.

On the hearing of these two bills before Judge Simmons, of the Macon circuit, (Judge Johnson, of the Middle, being disqualified on account of relationship to one of the securities) the respective complainants read in support of their applications for injunction the following:

1. The affidavit of James M. Smith, stating that he was governor of Georgia for the year 1876, and until January, 1877, when he was succeeded by Hon. Alfred H. Colquitt; that Renfroe was elected treasurer of said

state on January 13th, 1876; that more than forty days thereafter he tendered his official bond, which was not accepted, approved nor allowed to be filed and recorded, because the governor was not satisfied with the manner in which it was executed, not being signed by Renfroe himself, and not executed satisfactorily by some of the sureties, and because the governor was not satisfied that it was a valid security for $200,000.00; that said bond was not recognized in any way as the official bond of the treasurer, and no official bond having been executed, filed, approved and recorded, Renfroe was not qualified or commissioned as treasurer by virtue of said election.

2 Also, a certificate from I. W. Avery, secretary executive department, showing that the official bond of Renfroe, as treasurer, given in 1876, now among the records and papers of the department, was dated as follows, viz : " the ——day of ——, 1876;" that said bond bears no record of the day of filing, nor is there any record in the books of the department of the day of filing, and that said bond bears upon it the following indorsement : " Recorded in book Miscellaneous Records, pages 418, 419, 420, this 23d August, 1879. [Signed] J. F. Jones, Clerk Secretary State's office, Georgia;" that the official bond of said Renfroe, given in 1877, now on file in the executive office, bears date March 3d, 1877; that there is no record of the day of filing said bond in said department, and that said bond is indorsed : " Recorded in book Miscellaneous Records, pages 416 and 417, August 22d, 1879. [Signed] J. F. Jones, Clerk in Secretary State's office;" that the book of official oaths shows that Renfroe took his oaths of office on March 13th, 1877, and December 4th, 1875, and shows no oath of office taken by him in 1876, nor that any commission issued to him in 1876 under the election had in January of that year.

The bills, affidavit and certificate aforesaid having been read to the chancellor, the sheriff, through the attorney-general of the state in his official capacity, showed for

cause why the injunction prayed for should not be granted:

1. That there were not proper parties to said bill. The plaintiff in *fi. fa.* sought to be enjoined is Alfred H. Colquitt, governor, etc.

2. Because there is no equity in the bill, and no allegations entitling complainant to an injunction.

3. That there can be no judicial interference in such a case as this.

4. That the statement in said *fi. fa.*, that it was issued by the governor, cannot be attacked by allegations that said *fi. fa.* was issued without sufficient examination, etc.

5. That the superior court of Washington county had no jurisdiction of said case.

6. That if the chancellor should decide that no *fi. fa.* could legally issue for a breach of the first bond, dated —— day of ——, because not signed by the treasurer, this could not apply to the second bond, dated ——, and no injunction should issue to restrain said last mentioned *fi. fa.*

The chancellor granted the injunction prayed for in each of said bills, and the sheriff, through the attorney-general, excepted.

The cases were heard and determined together.

Clifford Anderson, attorney-general, for plaintiff in error, cited, on judicial interference, act of February 25th, 1876; Code, §§912, 3668; 23 *Ga.*, 66; 21 *Ib.*, 50; 27 *Ib.*, 354; 45 *Ib.*, 85; 59 *Ib.*, 353, 805, 811; 46 *Ib.*, 350. On parties, 3 Woods, C. C. R., 418. Bonds construed in connection with law, 5 Pet., 115; 15 *Ib.*, 290; 10 Wal., 295; 2 Cranch, 229. Bond not good as statutory, nevertheless valid as common law, 1 *Ga.*, 574; 3 *Ib.*, 499; 5 *Ib.*, 509; 9 *Ib.*, 314; 11 *Ib.*, 286; 5 Pet., 115; 2 Bailey's (S. C.) R., 336. See also 44 *Ga.*, 501; 10 *Ib.*, 414. Provisions as to approval of bond, etc., directory only, 11 Wheat. 188; 1 Pet., 318; 3 Mason, 446. Code, §167 remedies such defects. Provision of act of 1876 denying to Treasurer jury trial, etc., constitutional, 5 *Ga.*, 185,

194; 11 *Ib.*, 207; 23 *Ib.*, 566. Renfroe bound without a bond, 2 *Ga.*, 237.

JACKSON & LUMPKIN; E. S. LANGMADE; JAMES K. HINES, for defendants, cited statutes, showing history of prohibition of judicial interference, as follows: Act of 1791 (Marb. & Craw., 497); act of 1792 (M. & C., 499); act of 1793, of 1796 (M. & C., 512); act of 1797 (M. & C., 506); act of 1798, of 1799 (M. & C., 538–540); act of 1800, by 5th section, directed that same rules are to be observed as in tax law of 1797; act of 1804, sections 21 and 24, contains same provisions, and, as construed by supreme court, are found in sections 909 and 912 of Code. See 46 *Ga.*, 347; 2d Tidd's Prac., 1072 *et seq.*; Foster's *Sci. Fa.*, 330.

No judicial interference as viewed by the supreme court; 3d *Ga.*, 233; 5 *Ib.*, 186; 8 *Ib.*, 366; 9 *Ib.*, 186; 11 *Ib.*, 210; 18 *Ib.*, 48; 20 *Ib.*, 102; 21 *Ib.*, 55; 27 *Ib.*, 357; 33 *Ib.*, 623; 40 *Ib.*, 133; 42 *Ib.*, 428, 43 *Ib.*, 482; 45 *Ib.*, 87; 46 *Ib.*, 332, 359; 47 *Ib.*, 642; 49 *Ib.*, 201; 51 *Ib.*, 254; 53 *Ib.*, 592; 54 *Ib.*, 330; 56 *Ib.*, 291; 57 *Ib.*, 167; 59 *Ib.*, 354, 807; 60 *Ib.*, 61, 508; 63 *Ib.*, 736; *Wright, Comp. Gen.. vs. S. W. R. R.*, decided March 16th, 1880. See also 2 Brock., 447; 6 Mod., 224; 9 *Ib.*, 95; 9 Cranch, 173; Burrow, 2281; R. M. Charlton, 203.

If last section of act of 1876 be unconstitutional, fact that complainants executed bond after it had apparently become a law, not estop them. 49 *Ga.*, 267; 4 Wheat., 243; 10 Wis., 325. Liability of principal and securities on official bonds generally: Cooley on Tax., 500, 502; 21 How., 75; Hempstead, 39; *Colquitt,. Gov., vs. Smith et al.*, decided October 12th, 1880. Liability only for such money as was received by virtue of office. Brandt on Suretyship, 451; 17 N. Y., 242; 60 *Ib.*, 426; 2 Hill, 434; 9 Wheat., 680; 7 Barn. and Cress., 493; 10 Mo., 560; 20 Ohio, 330; 29 Ind , 294; 34 *Ib.*, 105; 45 *Ib.*, 267; 46 *Ib.*, 204; 8 La. Ann., 95; 2 Call. (Va.), 509; 18 *Ga.*, 48;

20 *Ib.*, 103; 47 *Ib.*, 642; 43 Wis., 81; 45 *Ib.*, 206. *Colore officii* and *virtute officii*, distinction: 2 Esp., 542; 15 John., 269; 19 Wend., 283; 37 Wisc., 43; 60 N. Y., 426, *supra.* See, also, 9 Otto: 231; 11 Mo., 462; 52 *Ib.*, 122.

Penalties, surety not liable for. 8 Rich., (Law) 412; 17 Ala., 808; Harper, 88; 67 Ill., 343; 14 *Ga.*, 5£8.

Laws authorizing summary executions strictly construed. Brandt, 515; Cooley on Tax., 508, 509; 30 Mich., 219; 2 Brock., 480; 8 Reporter, 698; 1 Barr, 126.

Resolution of December 8th, 1871, has declared that treasurer should not be liable for interest on public funds. Such legislation in accord with the decisions in Indiana. 53 Ind., 331; 36 *Ib.*, 346.

Judicial power cannot be vested in executive or legislative department. 34 Ill., 358; 5 Mich., 410; 17 Ind., 173; 2 Brock., 485; 18 How., 272; 8 *Ga.*, 229.

Indebtedness of treasurer must be shown by matter of record. 30 Mich., 216; 4 Ala., 725.

Obligation of surety accessory. 1st Pothier, 299; corollaries 1, 2 and 5. Code, §2149; Theobald on Prin. and S., 2; 17 Mass., 604; 2 Pick., 24; 10 Cent. L. J., 137; 7 *Ib.*, 438; 4 Watts, 21; 1 Martin, N. S., 665; 11 Vt., 449; 37 Mich., 590; 7 Neb., 13; 22 Ind., 399: 5 *Ga.*, 570; 4 Hump., 503; 21 Cal., 585. Chancery not reform as against sureties. 85 Ill., 179.

Bonds not statutory. 1 *Ga.*, 580; 3 *Ib.*, 512; 6 *Ib.*, 552; 9 *Ib.*, 316; 5 *Ib.*, 570. Treasurer's bond must be filed within forty days. Code, §154; supplement to Code, §22. Effect of failure to file within time. Code §§135, 155, 156; 46 *Ga.*, 636. Section 167 of Code inapplicable to this case. Taken from §132 of Code of Ala., of 1852; 33 Ala., 692. Not covered by 56 *Ga.*, 292. See 21 Cal., 585; 10 Bush., 34. Failure to file within time prescribed relieves sureties. 8 Cent. L. J., 427.

Failure of creditor to appropriate means in hand discharges surety. 3 *Ga.*, 251, 413; 4 *Ib.*, 397; 37 *Ib.*, 437; *Walsh vs. Colquitt, Gov.*, February term, 1880, Pam., 59.

"Due process of law" and "law of the land," Cooley's Const. Lim , 354 ; 10 Cent. L. J., 29.

Should the governor be made a party? 8 *Ga.*, 372 ; Story's Eq. Pl'd'gs., §§76. c *et .seq.*, 79, 96; High on Inj., §§115, 748, 801. Attorney-general appeared to represent interest of state under §22 of Code, and par 11, §10, art. 6 of Cons. of 1877, found in §637 of sup. to Code.

Discharge of surety by act of creditor after judgment, only relief is in equity. 3 *Ga.*, 251.

Cloud on title. High on Inj., §§147, 269, 367.

Multiplicity of suits. High on Inj , §§12, 13, 53, 374.

JACKSON, Chief Justice.

By direction of a resolution of the general assembly in 1879, the governor of the state, in January, 1880, issued two executions against John W. Renfroe and sureties, one for the sum of $5,037.81, and the other for $17,761.49, besides interest and penalties ; the first purporting to be on his bond as treasurer of the state under his election in 1876, to fill the vacancy of the preceding treasurer, and the other on his bond under the election of 1877 for the full term. These executions were levied on several tracts of land in the county of Washington, some as the property of Renfroe, and others as the property of Wilson, one of his sureties on both bonds. Thereupon Renfroe and Wilson each filed a separate bill praying that the sheriff of the county be restrained from selling the property levied on until the equities of the cases could be heard before the superior court of Washington county, and then that he be perpetually enjoined from enforcing them. The only party defendant to the bills is the sheriff, and they are brought in his county and the county of the *situs* of the property of complainants on which he has levied.

The presiding judge of the Middle circuit being disqualified on account of relationship to one of the sureties, the application for the injunction was heard before Judge

Simmons, of the Macon circuit, who granted the *ad interim* injunction, and the legality of that judgment is the error assigned. The question was tried before him on the bills and demurrers thereto, together with the certificate of Mr. Avery, one of the secretaries of the executive department, and an affidavit of ex-governor Smith.

1. The demurrer makes the point that the parties are not sufficient, the execution being issued by the governor of the state. The governor could not be made a party—being the head of a co-ordinate branch of the government, the courts may not well enjoin him—equity as well as law, would seem to forbid it. The process of the courts is directed to the. subordinate officers of the executive and those agents who are illegally using the authority of the state to oppress the citizens. The exceptions, if any, are few, when he can be brought into the courts officially at all. 8 *Ga.*, 372; Code, §3202; supplement to Code, 397; 23 *Ga.*, 438; 25 *Ib.*, 374; 31 *Ib.*, 277; 37 *Ib.*, 240; 43 *Ib.*, 605; 45 *Ib.*, 365.

His duty in the last resort is to enforce the process of the courts. Code, §51. The idea of making him a party defendant without his consent, is inconsistent with this great duty. He is the executive of the process of the courts, as well as for the enforcement of all law generally, and the administration and enforcement of law through the courts is at last the great practical benefit which government confers on the citizen.

Besides it is made his duty to defend suits against any person where the state is interested. Code, §§22, 74; and this has been done in this case—the attorney-general filed the demurrer for the sheriff, and the governor is in through his legal adviser and representative for all practical purposes, and in the only way in which he could well appear for the state.

2. It is again insisted that the superior court of Washington county has no jurisdiction of the cause, inasmuch as no substantial relief is prayed for against the sheriff.

The relief asked, if granted, would seem quite substantial. It would shield the real estate of complainants lying in that county, and seized by the sheriff, from all molestation by that officer, and by these executions, and would give complete relief, and the only possible relief in the premises, if the complainants are entitled to any. No other court or courts has jurisdiction; nobody else can be sued; this sheriff is the man who has seized these lands and is doing all the damage, and that damage can be arrested only by restraining him. But we think that this question was virtually settled in the case of *The Southwestern Railroad Company vs. the Comptroller-General* and the *Sheriff of Bibb County*, at the February term, 1880. There we upheld the jurisdiction of Bibb county, though the comptroller-general resided in Fulton, and though the superior court of Fulton county had jurisdiction of the same character of cases at common law on affidavit of illegality by special statute.

This court decided that as the sheriff was enforcing the tax executions in Bibb, by levying on property therein, and advertising it for sale there, that he was such a substantial party as to give the superior court of Bibb county jurisdiction. This is a stronger case than that for the jurisdiction. In that case there was another party—the agent who issued the *fi. fa.* and ordered the levy—and he resided in another county; in this there is no other party, and cannot well be another; and if the executions cannot be stopped by prayer for relief against him, they cannot be stopped at all—no matter how large and luminous the equities of complainants may be. Wherever there is a right there must be a remedy; and it must be in the jurisdictional power of some court in the state to apply the remedy and redress the wrong.

3. It is again insisted that under the Code and the statute which authorized the issue of these executions by the governor, there can be no judicial interference anywhere —that the statutes of the state expressly prohibit it—and

no seeming equities can rise higher than the mandate of the statute. Unquestionably if a valid act of the general assembly prohibits the interference of the courts, no court either of law or equity can intervene, and the one is as powerless as the other. The question therefore faces us, what does this statute mean? And if the answer be, it means that under no circumstances whatever—in no conceivable case—not even where the surety never, in fact, signed or authorized anybody to sign the bond—where the treasurer himself never made or tendered any bond at all—and yet the execution is issued and levied and the property of alleged principal and surety to a paper which neither ever executed, is seized and about to be sold— there can be no interference, the question faces us again, if that be the meaning, is the law so construed a valid, constitutional law?

First, what does the statute mean? The act of 1876, codified in supplement to the Code, section 20, prescribes that if the treasurer fails to perform the duties of his office, misapplies or uses the funds of the state, fails to account for and pay over any moneys that he may have received by virtue of his office, whereby he becomes liable to the state, it shall not be necessary to sue his official bond, but the governor is hereby authorized to issue a *fi. fa.* instanter against the treasurer and his securities for the amount due the state by the treasurer, with the penalties and costs, said *fi. fa.* to be directed to all and singular the sheriffs of said state, and shall be executed by them ; and the treasurer and his securities shall have only those defenses now allowed tax collectors against *fi. fas* issued by the comptroller-general against them.

Section 912 of the Code, enacts that " executions so issued, (that is against collectors of taxes), shall not be suspended or delayed by any judicial interference with them, but the governor may suspend the collection not longer than the next meeting of the general assembly."

Section 3668 of the Code, which is the parallel section

in regard to executions by collectors against tax payers, enacts that, "no replevin shall lie, nor any judicial interference be had, in any levy or distress for taxes under the provisions of this Code, but the party injured shall be left to his proper remedy in any court of law having jurisdiction thereof."

These sections, 912 and 3668, seem to have been codified from the tax act of 1804. Cobb's Digest, pp. 1051–2; the last, 3668, being an exact transcript of the latter part of section 21 of that act, except substituting the words "provisions of this Code" for the words "under this law;" and the other seems to be derived from the latter part of section 24 of the same act, which is, "and no execution issued by the treasurer in manner herein prescribed shall be stayed by reason of the death of the said collector or his securities, as to the sum due or the legality of the execution."

These sections of the Code and the sources whence they sprung have been before this court on several occasions, most, if not all, of which are cited by the exhaustive brief of the counsel for defendants in error; and it is not easy to reconcile them all with each other. But that judicial interference has been had in some cases, and that the most illustrious names that adorn the roll of the judges of this bench, Chief Justices LUMPKIN and WARNER, have authorized it to be done, and one or both delivered the judgment of this court sanctioning such interference, there is no doubt. 27 *Ga.*,357; Decisions of WARNER, C. J., in 42 *Ga.*, 428; 46 *Ga.*, 332; 47 *Ga.*, 642; 53 *Ga.*, 588; 54 *Ib.* 330; 59 *Ib.* 354, 807; 60 *Ga.*, 61, 508; *Wright, Comp. Genl., et al. vs. Southwestern Railroad Company*, February term, 1880. In the judgment in the last case, my late venerable colleague, Chief Justice WARNER, fully concurred; and my late learned associate, Justice BLECKLEY, as well as the late Chief Justice, always held that where the tax was unconstitutional, against law, there could be interference and the courts should interfere.

The truth is, that my own mind halted more in the path towards the final solution of the trouble than either of theirs; but the constitutions of 1868 and 1877, having required the judiciary to declare unconstitutional enactments inoperative, and the only mode I could imagine being on a case made invoking judicial interference, I was convinced that in such case interference could be had by the courts; and if for any other reason the imposition of the tax was clearly illegal, the same reasoning led me to conclude that there might be intervention by the courts. And so this court has held in regard to tax collectors as well as tax payers. 3 *Ga.*, 233; 43 *Ib.* 480; 51 *Ib.*, 252.

When, then, the act of 1876 *supra* remanded the treasurer to " *those defenses* " which the tax collectors might make to executions issued against them, the meaning must have been those defenses which the courts had allowed them to make and tax payers to make under the prohibitions of judicial interference. In other words, the construction which the courts had put on these sections of the Code entered into the legislative mind, and the defenses allowed the other defaulters were allowed the treasurer and his sureties.

This must be the meaning; otherwise the words "those defenses" in the act of 1876 are meaningless. They could not have referred to the clause that " the governor may suspend the collection not longer than the next meeting of the general assembly," for that can hardly be called *one* defense; certainly it is not "those defenses;" it is not more than one defense, if a defense at all. It is a mere petition for time. It is grace optional with the governor; it is no legal *defense* to an execution about to sell out a *defendant*, much less is it " *those defenses* " which the act of 1876 says that the tax collector had, and which it gave to the state treasurer and his sureties.

What, then, are those defenses which the tax payer or collector and sureties might make in the courts?

First, they might resist an unconstitutional exaction,

because such a thing called a tax is no tax. Secondly, where the law does not impose the tax or authorize the execution, for the same reason that the exaction is not a tax, and the execution, not being authorized by the statute or in conformity to it, is not that process which the law declares shall not be interfered with by the judiciary; and thirdly, where the defendants were not in fact the tax collector or sureties for such an officer, or executed no bond, for the reason that the bond on which the execution is based, was no bond, or the principal proceeded against was not a tax collector or the surety not a surety.

Perhaps other illustrations of what may be termed exceptions to the general rule, our reports will furnish, but the above seem to us deducible clearly from those reports, and sound and irresistible as propositions almost self-evident, if not entirely so.

4. Applying these principles to this case, and giving the treasurer and sureties those defenses which the law gave to tax collectors and sureties, how stands the case?

In regard to the first execution, that for 1876, the facts are that Renfroe never signed a bond at all, that Governor Smith never accepted any, and the execution is based on a paper as a treasurer's bond which the principal never executed, and the state never accepted. It is a contract under seal never made by the obligor and never delivered to or received by the obligee. This appears from the face of the paper itself, from the deposition of governor Smith, and the certificate of Mr. Avery.

The act of 1876 did not contemplate a summary and irresistible *fieri facias* to issue upon such an unexecuted paper. The execution is not then within the statute, is not authorized by that or by any other law, and is in conflict with all law of which this court has ever heard. The so-called bond is no bond, either statutory or at common law, and has no more force than a blank. No execution to make money out of anybody can be based on it, and to arrest such an execution the judiciary of the state must intervene.

5. The other and larger execution, issued on the bond of 1877, is not so free from doubt. The bond on which it is based is signed by the treasurer and sureties, including the complainant, Wilson, and therefore there is a treasurer's bond, accepted, too, by the governor, and of file in the executive department, but not within the time prescribed by law. Nor does it appear to have been taken in accordance with the act of 1876 and the Code of the state in several other particulars. It was not exe. cuted within forty days from the election of the treasurer. It was not recorded within the time prescribed by law in the office of the secretary of state, and the sureties not one of them made oath that he was *bona fide* worth over and above his debts, exemptions and liabilities of all kinds, property in realty and personalty not less than the specified sum for which he was bound; nor was this oath attached to the bond and recorded therewith, as required by the act of 1876. It cannot, therefore, be said to be a statutory bond, taken in accordance with the act of 1876 and statutes in *pari materia.*

This court has repeatedly ruled on this point and been strict in holding that to make a valid statutory bond there must be a rigid compliance with the statute; 1 *Kelly*, 580, and subsequent decisions *passim;*—and that, where no summary remedy with very limited defenses is allowed, but where regular suits on the bond, and verdict and judgment, after trial by jury, must precede final process.

Of course the ruling should be at least as strict where, without trial, the execution is issued *instanter.* There are other failures to comply with the statute in the verbiage of the bond and other requirements of the law touching it; but these are sufficient to show that it is not a valid statutory bond.

6. But section 167 of the Code is invoked by the attorney-general to show that if bad as a statutory bond and yet good as a common law bond, this statutory and summary remedy may be based upon it. That section is:

"Whenever any officer, required by law to give an official bond, acts under a bond which is not in the penalty payable and conditioned nor approved and filed as prescribed by law, such bond is not void, but stands in the place of the official bond, subject, on its condition being broken, to all the remedies, including the several recoveries which the persons aggrieved might have maintained on the official bond."

The meaning of this statute or section of the Code, we think, is to be gathered from the earlier decisions of this court, whence the codifiers drew it. Those decisions were that the bonds were valid, though not in accordance with the statute, but when one recovery was had on the bond for the benefit of one person aggrieved, then it was exhausted, and all others, however much damaged, were remediless. In codifying these decisions, the compilers, following the Alabama code, by direction of the statute which created them, gave these remedies to all suitors successively until the penalty was exhausted. 1 *Kelly*, 574; 5 *Ib.*, 499.

This summary remedy by the state against the treasurer was not in the contemplation of that act; for that is the creation of the act of 1876, long afterwards. Nor does any summary remedy by the state against any public officer seem to have been included. The section gives to persons aggrieved all the remedies which they might have maintained on the official bond, and none of them ever had any summary remedy against any public officer on his official bond. All must sue regularly, and prove the breach and recover the damage proved to the satisfaction of court and jury after trial. And the context of the section—those sections preceding and following 167—show that the bond is to remain valid for such remedies and such only as persons wronged by these officials might have.

7. It may well be doubted, too, whether this bond is good at all in so far as the sureties are concerned, when

none of them qualified as to the estate they possessed over and above indebtedness and exemptions. However, as none of them took the oath themselves, and perhaps each signed with the knowledge that the others had not qualified, it would not lie in their mouths to make this objection to the bond as a common law bond, especially as it is recited in the bond that an oath was taken, though the oath itself is not attached to the bond as required by the statute. It is also true that each was bound for a certain amount, but each was entitled, nevertheless, to contribution from every other, and, unless estopped by his own conduct, was entitled to have that other sworn as to his capacity to respond. At all events, the require-ment of the oath is not merely directory, but it is of con-sequence primarily to the state and secondarily to the sureties; and certainly it is of sufficient importance to vitiate the bond as a statutory bond, and in the view we take of the scope and operation of section 167 of the Code, if it be good as a common law bond only, this sum-mary proceeding cannot rest upon it.

8. To our minds, also, there is difficulty in the manner in which the execution was issued. The act of 1876 is a general law, making it the duty of the governor to issue execution on bonds taken in accordance therewith for sums which he shall find due according to modes chosen by himself. Of course this he may do by agents or by any sources of information deemed reliable by him; but he is to be left free to select his agencies and sources of information.

This is the extent of the ruling in 46 *Ga.*, 325 and 350, and those cases rested on a special act in regard to the officers of the state road. There, too, the court would not permit the parties to go behind the face of the exe-cutions. But these executions show on their faces that a special joint resolution was passed, fixing the amount of liability and requiring the Governor to issue the execu-tions for those sums. Is not this special legislation—case

legislation, and is it not in the teeth of the constitutions of 1868 and 1877? Code, §5018 ; Sup., to Code §505. " No general law affecting private rights shall be varied in any particular case by special legislation except with the free consent in writing of all persons to be affected thereby," is the language of both constitutions. Does not this special joint resolution affect the private rights of the treasurer and of his sureties, and does it not vary this general law and specify certain sums for which executions are to issue?

If suspension of the execution by the governor and appeal to the legislature is the only redress of the treasurer and his sureties, it would seem that the appellate power had taken the initiative, and prejudged the case it was to try. The general law cannot be and ought not to be allowed to be so varied as to meet the emergencies of special cases, either to confer favors or to inflict retroactive penalties upon citizens or officials. Unquestionably under patriotic impulse, and to redress what the general assembly deemed a great wrong, the special resolution was passed, but the prohibition against varying general laws to suit special cases, is put in the fundamental law for the very purpose of preventing impulse from controlling legislation, or emotion towards individuals, whether of indignation or sympathy, from influencing the cool current of legislative judgment. It is true this is a joint resolution, yet it is legislation and has accomplished the purpose of special legislation, to-wit: to have these *fi. fas* issued for certain amounts and collected out of certain people. Suppose it had passed a special act to the effect that execution issue for certain sums against Renfroe and his sureties, and that no defense should be made to their collection, and that no court should arrest the proceedings, who would uphold the law as constitutional or in accordance with the great underlying principles of right in all civilized societies, where private property is protected by law? And yet this is precisely what has been done, except that

the act is in the shape of a joint resolution, if it be true that the courts cannot intervene. Such cannot be the law.

We hold, therefore, that the courts may interfere, and ought to do so, by bill in equity and injunction, if there be no adequate remedy at law, and if thereby the equities set out in the bill authorize it. It is alleged that affidavits of illegality have been tendered and refused by the sheriff, that the lands of complainants are divided among divers tenants, that they have crops growing, and if dispossessed, multiplicity of suits would result, that the sale of their property, however illegal, would cloud their title, that the sheriff could not respond to the damage done, not having property enough, and his bond not covering the half of the executions; and in view of these allegations the complainants invoke the restraining order of the chancellor until all the questions made can be fully tried.

We cannot see that the chancellor erred in granting that restraining order. It may be that the treasurer and surety are liable to respond to the state for the money made by the use of the public funds. It may be that, on proper pleadings, by answer, or answer in the nature of cross-bills to these bills of complainants, recovery may be had by the state for such sums as may have been received by the treasurer and his sureties on account of interest which he made by the use of public money. On these questions we decide nothing. All that we do decide is that on neither of these bonds can these executions summarily make the money which is therein specified, and that until the whole case can be fully and fairly heard in open court, the chancellor was right to grant the *ad inte rim* injunction.

Judgment affirmed.