$$\left|\begin{matrix} 99 & 1 \\ d102 & 37 \end{matrix}\right|$$

BROWN, executor, *et al. v.* BARNES, sheriff, *et al.*

1. An execution against a lessee of convicts and the sureties upon the bond of such lessee, issued by the comptroller-general under the act of February 17, 1876 (Acts of 1876, p. 46), authorizing him to collect by execution debts due the State by such lessees, is not void because one or more of the sureties named in the execution had died before the same was issued.

(a) If, before issuing the execution, the comptroller-general had become informed of the death of one of the sureties, he could lawfully issue the execution, as to that particular surety, against his legal representatives.

2. When such an execution was about to be levied upon the property of a surety, the principal in the bond (the lessee) could not arrest its progress by giving the sheriff written directions to levy upon the property of the principal situated in another county, although such property was of more than sufficient value to satisfy the execution.

August 10, 1896.

Petition for injunction. Before Judge Lumpkin. Fulton county. April 25, 1896.

*Bishop, Andrews & Hill*, for plaintiffs.

*J. M. Terrell, attorney-general*, for defendants.

LUMPKIN, Justice.

On the 17th of February, 1876, the General Assembly passed an act authorizing the comptroller-general to collect

by execution debts due the State by lessees of penitentiary convicts. It provided that "whenever any debt due the State by any company of the lessees of penitentiary convicts is placed with the comptroller-general for collection, and an itemized account of the same being certified to by the principal keeper of the penitentiary as correct and unpaid, it shall be the duty of the comptroller-general, after thirty days written notice to such company of lessees, to issue execution against such lessee, or lessees, and their securities on their bond, for said amount so certified to, and all costs, which shall be collected as are executions by said officer against defaulting tax-collectors." Acts of 1876, p. 46. Afterwards, on the 21st of June, 1876, a contract was entered into between the Governor and the Dade Coal Company and others, by the terms of which the State of Georgia leased to that company certain convicts for a term of years, the contract stipulating the rental to be paid by the company for such convicts. On the same day, that company entered into a bond, with Joseph E. Brown, John T. Grant, W. C. Morrill and Jacob W. Seaver as sureties, conditioned, among other things, for the payment by the Dade Coal Company of the annual rental due by it to the State according to the tenor of the contract above mentioned.

On the 13th of January, 1896, the comptroller-general, under the authority conferred upon him by the above mentioned act of 1876, issued two executions, directed to all and singular the sheriffs and other lawful officers of this State, commanding them, that of the goods and chattels, lands, tenements and franchises of the Dade Coal Company, as principal, "and of Joseph E. Brown, deceased, in the hands of Elizabeth Brown, as executrix, and Julius L. and Joseph M. Brown, as executors of said deceased, to be administered, John T. Grant, W. C. Morrill and Jacob W. Seaver, as securities," they cause to be made certain specified amounts due to the State for the hire of con-

victs. These executions were levied upon property belonging to the estate of Joseph E. Brown, in Fulton county. His executrix and executors filed an equitable petition to restrain further proceedings thereon. This petition was based upon two grounds. One was, that the executions in question were proceeding illegally, because John T. Grant and W. C. Morrill, two of the sureties upon the Dade Coal Company's bond, had departed this life, and for this reason the execution should have been issued against their legal representatives, so that upon payment of the same by the representatives of Joseph E. Brown, they could enforce contribution from the estates of these cosureties by having the executions levied upon property belonging to those estates. The other ground of complaint was, that these executions were proceeding against the property of the estate of Joseph E. Brown illegally, because the president of the Dade Coal Company had given written directions to the sheriff to levy upon property of the principal in Dade county, which the petition alleged was of more than sufficient value to satisfy these executions. The refusal of the trial judge to grant the injunction prayed for is the error assigned in the bill of exceptions.

1. As the act of 1876 was passed before the contract for the lease of the convicts was made, this act necessarily entered into and became a part of that contract. In our opinion, the General Assembly, by providing that executions issued by virtue of this act should be collected as are executions against defaulting tax-collectors, intended to place executions against defaulting lessees, and their sureties, upon the same footing as executions against defaulting tax-collectors, and to clothe the former with the same immunity from judicial interference as the law does the latter. We think this is so, because it seems to be the settled policy of this State, in the collection of all sums due to it, that there shall be no interference by the judiciary. This is undoubtedly true as to executions issued against

tax-collectors and tax-receivers, for section 912 of the code expressly provides that "executions so issued shall not be suspended or delayed by any judicial interference with them." And as far back as 1857, this court held that the courts were prohibited from entertaining affidavits of illegality to executions proceeding against defaulting tax-collectors and their sureties. *Eve et al.* v. *The State*, 21 *Ga.* 50. The decision in that case was based upon the tax act of 1804, which made it the duty of the treasurer to issue executions against defaulting tax-collectors and their sureties. Cobb's Dig. p. 1052. This duty, by the act of 1823, was devolved upon the comptroller-general. *Ibid.* 1025. The general rule that there can be no judicial interference hindering or delaying the State in the collection of taxes is stated in *Decker et al.* v. *McGowen*, 59 *Ga.* 805, and recognized in *Mayo* v. *Renfroe*, 66 *Ga.* 408. In the case of *Eve* v. *The State, supra*, one of the grounds of illegality was, that the execution had issued against one of the sureties on the tax-collector's bond after his death, and not against his legal representative. It is fair, however, to say that the question thus made was not distinctly decided by this court, it holding generally that there could be no judicial interference with the execution for any cause. That case, however, strongly supports our decision in the case at bar, if we are correct in the position that the executions with which we are now dealing stand upon the same high plane as to non-interference as executions against tax-collectors and the sureties on their bonds. That this position is correct, seems to follow from the reasoning of Chief Justice Warner in *Scofield et al.* v. *Perkerson et al.*, 46 *Ga.* 350. Note specially his language on page 360. The executions dealt with in that case were issued to collect public revenue due to the State from defaulting officers of the Western & Atlantic Railroad, and it was held that inasmuch as the remedy against those officers was the same as against tax-collectors and tax-receivers, the courts of this

State had no power to restrain the Executive Department in collecting that revenue by the process of execution. Applying the doctrine of that case to the case in hand, why should the General Assembly provide for the issuing of executions against lessees of convicts, and their sureties, and for collecting the same as executions against defaulting tax officers, unless it was intended to exempt the State from delay and inconvenience in the one case as well as in the other? No good reason to the contrary suggests itself to our minds. If, then, there can be no judicial interference with executions issued under the act of 1876, it would make no difference that some of the sureties named in the executions had died before the same were issued, and the discussion might end here. We are by no means sure, however, that the General Assembly did not deliberately intend that these executions should be issued against the sureties by name, irrespective of the question whether they were dead or alive. In section 3 of the above cited act of 1823, relating to executions against tax-collectors and their sureties, it was expressly declared that "in the event of the death of the collector, or either of them, or all of his securities, the execution shall issue against the survivors and the legal representatives of the deceased." This section has been superseded by section 909 of the code, which reads: "If any collector shall fail to settle his accounts with the comptroller-general in the terms of the law, he shall issue execution against him and his sureties for the principal amount, with the penalty and costs." In a marginal note the act of 1823 is referred to, and it seems very significant that in bringing forward the substance of that act into the code, the codifiers deliberately omitted the requirement that, in case of the death of a surety, the execution should be issued against his legal representatives. Again, it will be observed that the act of 1876 declares, without qualification, that the executions issued under it shall be against the lessees "and their securities on their

bond," and makes no provision for any change whatever in the form of the execution in case of the death of a surety. Why may we not conclude that this omission, both in section 909 of the code and in the act under review, was deliberately made, and for a purpose? Why should the State be subjected to the burden of ascertaining when a surety had died, or who was his executor or administrator? Is it not reasonable to suppose that the General Assembly intended that she should have a speedy remedy by execution against the property of her debtors, and should not be embarrassed by the delay and difficulty of ascertaining what sureties had died and by whom their estates were represented? In this identical case, it is a matter of considerable doubt whether the estate of W. C. Morrill really has a legal representative.

Nothing now ruled will interfere with the right of the estate of Joseph E. Brown, upon payment of these executions, to have contribution from the living cosurety, Mr. Seaver, or the estates of the deceased cosureties; but we do not think the representatives of the Brown estate have any absolute legal right to have the executions in question so issued that they may summarily enforce their right to contribution by a levy or levies. This right depends upon payment, and not upon the mere fact of the issuing of the executions.

While we think the executions are not illegal because issued against dead sureties by name, there can be no objection, as to a particular cosurety, in issuing them against his legal representatives, when the comptroller-general had information as to the real facts of the case. And indeed, this would apply to all the deceased sureties. Upon this point there was no controversy. The plaintiffs in error conceded that in so far as the executions were issued against them as the executrix and executors of Joseph E. Brown, they had no cause of complaint.

2. The State had the right to have the executions levied

upon any property subject to them, no matter to whom it belonged, and the principal defendant in execution could not force the State to proceed against its property instead of that belonging to one of the sureties. If, when the sheriff was about to levy upon the property of the estate of Joseph E. Brown in Fulton county, one of his legal representatives had pointed out other property of that estate in the same county sufficient to satisfy the executions in full, it might have been the duty of the sheriff to seize the property thus pointed out, instead of that upon which he had originally intended to levy. But we are quite certain that one of the executors, in his capacity as president of the Dade Coal Company, had no right to constrain a levy upon the property of the company in Dade county, and thus arrest the executions from proceeding against the property of the surety in Fulton county.        *Judgment affirmed.*