LOCKE v. The PENELOPE.  See Case No. 16.946.

---

## Case No. 8,441.

### LOCKE v. POSTMASTER GENERAL.

[3 Mason, 446.] [1]

Circuit Court, D. Massachusetts.  Oct. Term, 1824.

OFFICIAL BOND—SURETY—RELEASE—POSTMASTER.

The neglect of the postmaster-general to sue for balances due by postmasters within the time prescribed by law. although he thereby is rendered personally chargeable with such balances, is not a discharge of the postmasters on their sureties upon their official bonds.  Nor is an order from the postoffice department. directing a postmaster to retain the balances due until drawn for by the general postoffice.

[Cited in United States v. De Visser. 10 Fed. 648; Hagood v. Blythe. 37 Fed. 250.]
[Cited in Read v. Cutts. 7 Me. 193; Mayor. etc.. of Newark v. Stout (N. J. Sup.) 18 Atl. 948; Watertown Fire Ins. Co. v. Simmons, 131 Mass. 86.]

Debt, upon an official bond given on the 23d of December, 1811, by John Walker, Jr. (who was appointed postmaster at Burlington, Massachusetts,) and by one John Walker and the defendant. Joseph Locke, as his sureties, to the postmaster-general, conditioned for the faithful performance of the duties of his office by Walker, as postmaster at Burlington.  Plea of general performance. Replication. the neglect of Walker to pay over the sum of $181.08, for which he was indebted as postmaster.  Rejoinder, that the postmaster-general, on the 14th of December, 1812, gave a written order to Walker, to detain the balances due until drawn for by the general postoffice. which order remained uncountermanded until the dismissal of Walker from office, and that thereby Walker was prevented from paying over the balances, which subsequently became due every quarter; and that the postmaster-general neglected to sue for the same balances with six months after the expiration of each quarter. To this rejoinder there was a demurrer, and joinder in demurrer.

Mr. Shaw, for defendant, contended, 1. That the giving of time to the principal by the written order of 1812 was a discharge of the surety; 2. That the omission of the postmaster-general to sue for the subsequent balances within six months after they became due. according to the 29th section of the postoffice act of 1810, c. 54 [2 Story, Laws,

1 [Reported by William P. Mason, Esq.]

1165; 2 Stat. 602, c. 37], was such laches as worked an extinguishment of the right of action. He further contended, that the bond was not to be considered as a public bond due to the government, but a private bond to the postmaster-general, and so like a bond given to any other individual. And he cited Ludlow v. Simond, 2 Caines. Cas. 1; People v. Jansen, 7 Johns. 332; Samuell v. Howarth, 3 Mer. 272; Hunt v. U. S. [Case No. 6,900]; Holt, N. P. 84; 2 Brown, Ch. 581; 4 Ves. 833; Bean v. Parker, 17 Mass. 591; Cro. Eliz. 396.

Mr. Blake, for the United States, argued e contra on all the points, and cited U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720, 735; Davey v. Prendergrass, 5 Barn. & Ald. 187.

STORY, Circuit Justice. The pleadings in this case are very loose and inartificial, and must be pronounced insufficient for a judgment, if objected to. But the parties have expressly waved all exceptions on this head, and desire, that the case should be decided upon its merits. The case, then, which is meant to be presented for the consideration of the court, is as follows: The action is brought upon a bond given by John Walker, Jr. and the defendant as his surety, for the official good conduct of Walker as postmaster at Burlington. The condition is in substance (after reciting the appointment), that Walker "shall well and faithfully, once in three months, and oftener if thereto required, render accounts of his receipts and expenditures, as postmaster, to the general postoffice, in the manner and form prescribed by the postmaster-general in his several instructions to postmasters, and shall pay all monies, that shall come to his hands for the postages of whatever is by law chargeable with postage, to the postmaster-general of the United States for the time being, deducting only commission, &c., and shall faithfully do and perform, as agent for the general postoffice, all such acts and things, as may be required of him by the postmaster-general, and account for all moneys, bills, bonds, notes, receipts, and other vouchers, which he, as agent as aforesaid, shall receive for the use and benefit of the said general postoffice." By the replication it appears, that a balance of $181.08 is due to the general postoffice by Walker; and this fact is not denied. But the rejoinder states as a defence, first, a written order of the postmaster-general, of the 14th of December, 1812, requesting Walker "to retain in his hands the balances arising on his postoffice accounts until drawn for" from the general postoffice, which order was in full force until Walker's dismissal from office, whereby he was prevented from paying over the quarterly balances until his dismissal; and, secondly, the omission of the postmaster-general, notwithstanding these balances were unpaid, to sue for the same within the six months prescribed by law.

I have said that the defendant, Locke, is a

surety; but he is not so described in the bond. It is, however, an irresistible inference from the recital and tenor of the condition, since he is bound, not for his own acts, but for those of a third person. The questions then raised at the bar are, first, whether Locke, as a surety, is discharged by the order of 1812, directing Walker to retain the balances until drawn for; secondly, whether the omission of the postmaster-general to sue for the same balances within the six months prescribed by law, is a bar to the action.

At the argument it was suggested, that the present bond was not a public, but a private obligation, given for the indemnity of the postmaster-general, and that, therefore, it ought to have the same construction as any other contract between private persons, and to be affected by the common doctrine of laches. It appears to me, however, that the postmaster-general is a public officer, superintending a great department of the government, and all the postmasters appointed under him are public officers of the government. Their appointment is regulated, and their duties are prescribed by general laws, and their official misdemeanours are visited with heavy punishments. There is not a single clause of the postoffice acts, which does not contemplate them as public agents, and not as mere private servants of the postmaster-general. It is true, that there is no provision in the existing laws, which requires them to give, or the postmaster-general to demand, official bonds for their good conduct. But the practice is believed to be coeval with the earliest institution of the office, and a clause in the 29th section of the postoffice act of 1810 (chapter 54) manifestly contemplates all such obligations as public contracts for the sole use and benefit of the government. That clause provides, "that all suits, which shall be hereafter commenced for the recovery of debts or balances due to the general postoffice, whether they appear by bond or obligations in the name of the existing or any preceding postmaster-general, or otherwise, shall be instituted in the name of 'The Postmaster-General of the United States.'" There cannot be a doubt, that all the monies recovered on these official bonds belong to the government, and are not the private property of the incumbent in the office of postmaster-general at the time, when they are taken. In truth, the whole structure of the laws proceeds upon the notion, that the postmaster-general is but an agent for the United States, as to all official acts and contracts; and the very fact, that the suit may be in his official name, without any personal designation, demonstrates the sense of the legislature in the fullest manner. Such, as far as I know, has been the uniform and unquestioned construction of the laws on this subject. I consider it, therefore, clear, that this is a public bond for the benefit of the United States, and

taken ex officio upon this known interpretation of its obligatory force. The case is then to be considered precisely in the same manner, as if the government were directly a party to the suit, instead of their official agent.

That there has been a breach of the condition of the present bond cannot well admit of dispute. The terms of the condition are general, that Walker "shall pay all moneys, that shall come to his hands for the postages, &c. to the postmaster-general of the United States for the time being," and the pleadings admit an unpaid balance, for the recovery of which the suit is brought. Why should not the plaintiff have judgment for this amount?

It is said, that the order of 1813 is a contract giving time for payment to the debtor, injurious to the surety, and against the express injunctions of law. The postoffice act of 1810, in the first section, directs, that the postmaster-general "shall obtain from the postmasters their accounts and vouchers for their receipts and expenditures once in three months or oftener, with the balances thereon arising in favour of the general postoffice." Comparing this with the provisions of the 29th section, on which I shall hereafter have occasion more particularly to comment, the fair inference certainly is, that the postmaster-general is to require quarterly payments of all balances due to his department, and the omission to do it is a plain departure from duty. But these sections constitute no part of the obligation of the present bond. They are public regulations, directory to the postmaster-general, for the fulfilment of which he may be justly held responsible; but they form no condition in the contract with the postmasters or their sureties. The latter, in entering into any bond, may rely on the provisions of the law, and the fidelity of the officers of the government in the regular discharge of their duties; but unless there is a special contract for such fidelity, forming a part of their bond, as a condition of its obligation, they are presumed to confide in their own vigilance, and the interest of the government in enforcing a punctual accounting by the postmasters.

But is the order of 1813, in any just sense, a contract giving time to the postmaster? It merely authorizes him to retain the balances until drawn for. It does not stipulate, that he shall retain them for any particular period. They may be drawn for the next hour, the next day, or the next week. The postmaster has no right granted to him to retain them a moment, except as a mere depositary. The reason for such an order must be obvious. In the numerous small postoffices scattered through the country, the quarterly balances must always be very small, and often in such unequal sums for transmission by the mail to the general postoffice, that the inconvenience, as well as the risk, of transmission would be very great to the parties. An order, that should authorize the postmasters to retain such small balances during the pleasure of the department, so far from being injurious to the sureties, might sometimes save them from serious losses. At all events, where there is no contract for a specific delay, but a mere discretionary forbearance to enforce the law, the case does not, in the most favourable view, come up to the doctrine of those adjudications, which have been cited at the bar.

What is that doctrine? Not that a mere delay to require a performance of the contract, at the time stipulated is a discharge of the surety; but that a contract, postponing payment until a future day, and creating obligations inconsistent with the original contract, is a discharge of the surety. In Skip v. Huey, 3 Atk. 91, the obligee cancelled the bond, and took notes payable at future days in payment, and afterwards, these being unpaid, brought his suit to set up the bond in equity against the surety. Lord Hardwicke very properly refused the application; and the remedy at law was gone against the surety. In Nisbet v. Smith, 2 Brown, Ch. 579, the obligee, without communication with the surety, took a warrant of attorney to confess judgment from the principal with an agreement, that no execution should issue for the debt for three years; and Lord Thurlow held the surety discharged. In Rees v. Berrington, 2 Ves. Jr. 540, the obligee took notes for the debt from the principal payable at a future day. Lord Loughborough said: "The form of the security forces these cases into equity; but take it out of that form; and suppose in this instance, that the plaintiff was surety by a proper bond at law, as surety, what is the consequence? Where a man is surety at law for the debt of another, payable at a given day, if the obligee defeats the condition of the bond, he discharges the security." And he accordingly held the security discharged. Law v. East India Co., 4 Ves. 824, recognizes the same principles. Lord Eldon, in Boultbee v. Stubbs, 18 Ves. 20, acted upon them, and in Samuell v. Howarth, 3 Mer. 272, he assumed them to be undeniable. It is observable, however, that these were all cases in equity, where there was an express contract for delay, and not a mere forbearance during pleasure, after the debt was due. The ground perpetually alluded to by the court is, that the obligee had disabled himself from calling in the intermediate time upon the principal, and thus had changed the legal predicament of the surety. But in none of these cases was any doctrine broached, that if the obligee had said to the principal, "Retain the money until I call for it, or draw for it," that would have been a discharge of the surety. What difference is there in point of law between an express declaration to retain the money, until called for, and an implication to the same effect, deducible from the forbearance to demand payment? I adhere to the doctrine, which was stated in Hunt v. U. S. [Case No. 6,900], and which I am glad to find supported by the authority of Mr. Chancellor Kent (King v. Baldwin, 2 Johns. Ch. 554. See, also, Ludlow v. Simond, 2

Caines, Cas. 1), that mere delay without fraud, or a contract for a specific forbearance, is not a discharge of the surety. It is not a discharge even in equity; a fortiori, it is not at law.

And this leads me to say a few words as to the proposition asserted at the bar, that if the defence were now good in equity, it is equally good in law. I exceedingly doubt that. Something to the effect fell from Lord Loughborough in Rees v. Berrington; and Lord Eldon, at a late period, seems to have understood, that the courts of law, contrary to their former practice, now held, that the principles, which will discharge a surety in equity, will operate to discharge him also at law. Samuell v. Howarth, 3 Mer. 272, 277. But it does not appear to me, that any such general and broad doctrine is sustained by the authorities. In respect to bills of exchange, guaranties, and other commercial contracts, not under seal, courts of law have been long in the habit of treating them as subject to a very enlarged equity, and affected by defences, which, in former times, would have driven the parties into a court of chancery. But sealed contracts have not as yet been adjudged to be liable to the same consideration. There are stubborn rules of the old law, which prohibit it. In Trent Navigation Co. v. Harley, 10 East, 34, Lord Ellenborough denied, that mere laches in the obligee would discharge a surety at law, however it might be in equity. In Moore v. Bowmaker, 6 Taunt. 379, 2 Marsh. C. P. 81, the court of common pleas held, that the giving time to the plaintiff in replevin was no discharge of the surety of the replevin bond. In the very late case of Davey v. Prendergrass, 5 Barn. & Ald. 187, the question came directly before the court of king's bench. It was debt on a bond conditioned for the payment of money, and a special plea was put in, that the creditor had given time to the principal, and taken a warrant of attorney for payment of the debt by instalments. Upon demurrer, the court held the plea bad, upon the ground, that the obligation, created by a sealed instrument, could not be discharged except by an instrument of equal validity, and that therefore the parole agreement for time was not a discharge of the bond, either against principal or surety. The proper remedy was in equity. It appears to me, that this decision is well founded in law, and proceeds upon principles that cannot be shaken without danger of confounding the distinct jurisdiction and duties of courts of law and of equity. The case of Orme v. Young, Holt, N. P. 84, before Lord Chief Justice Gibbs, although earlier, does not in the slightest degree trench upon this doctrine. The only question in that case, which could properly come before the court, sitting at nisi prius, was, whether the issue was proved; and there is not a syllable which dropped from the judge that establishes the validity of such a plea at law. But I refer to the language of Lord Chief Justice Gibbs on that occasion, showing his understanding of the rule in equity, as directly applicable to the defence now under consideration. He says: "If the creditor have given time to his debtor, the surety cannot sue him (i. e. the creditor in equity;) but the fact to be tried is, was time of payment given without the privity of the sureties? What is forbearance and giving time? It is an engagement, which ties the hands of the creditor. It is not negatively refraining, not exacting the money at the time; but it is the act of the creditor, depriving himself of the power of suing by something obligatory, which prevents the surety from coming into a court of equity for relief; because the principal having tied his own hands, the surety cannot release them." Now apply this test to the present case. Where is the contract disabling the postmaster-general for a moment from suing the debtor? Where is the incapacity of the surety to come into equity, and demand to sue the debtor in the name of the postmaster-general? I am fully aware that in the case of People v. Jansen, 7 Johns. 332, the supreme court of New York held, that the defence was good at law; but with the utmost deference for that learned court, I have never been able to reconcile that case to my own judgment, and its authority has been expressly denied in the recent case of U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 760, by the supreme court of the United States.

There is another point of view, in which this part of the defence may be presented, which ought not to be forgotten. It is, that as the postoffice act has expressly required quarterly payments to be made by all postmasters, any contract by the postmaster-general, which impugns this provision, is utterly void from its illegality. So that if such a contract had been made, it could not have been available to the party; and the right of action on the bond would not have been for a moment suspended. It requires no argument to show, that a void contract for delay is, in respect to the public, precisely the same in effect, as if no contract had been made. It appears to me, therefore, that the first ground of defence, considered either at law or in equity, is unsustainable and must be abandoned.

The other point, whether the neglect of the postmaster-general to sue the debtor within the period prescribed by law is a discharge of the surety, may be disposed of in a few words. The act of 1810 (section 29) provides: "That if any postmaster, or other person authorized to receive the postage of letters and packets shall neglect or refuse to render his accounts and pay over to the postmaster-general the balance by him due at the end of every three months, it shall be the duty of the postmaster-general to cause a suit to be commenced against the person or persons so neglecting or refusing; and if the postmaster-general shall not cause such suit to be commenced within six months from the end of every such three months, the balances due from every such delinquent shall be charged

to, and recoverable from, the postmaster-general." The clear inference from this provision is, that until such default the postmaster-general shall not be chargeable with such balances; but they are to be deemed debts due to the public. His default does not change the nature of the debt, but gives a right to the government to charge him with a personal responsibility by way of penalty. But his personal responsibility does not exonerate the principal or his sureties. If a recovery is had against them, it is for the benefit of the government. Suppose the postmaster-general were insolvent, would the government be confined to a remedy against him? The act does not intend to discharge the principal or his sureties, either as against the government, or the postmaster-general, but merely superinduces a collateral personal liability by his neglect of duty. What, then, is the point on which the defence rests? It is, that the neglect of a public officer to require payment of a public debtor within the time prescribed by law discharges the surety. No further answer need be given to this, than that the doctrine has been expressly overruled by the supreme court, in U. S. v. Kirkpatrick [supra]. In that case the comptroller of the treasury was required by law to sue for all quarterly balances due and unpaid by the collectors of internal taxes; and the court held, that the neglect to sue was no discharge of the sureties.

Without going more at large into the subject, my opinion is, that the defence is bad in substance, and if pleaded in the most regular manner, it could not avail the present defendant. The judgment must, therefore, be given in favour of the. United States. Judgment accordingly.