Colquitt, governor,` vs. Simpson & Ledbetter.

[This case was argued at the last term, and the decision reserved.]

1. Where purchasers of property from one who was the president of a bank knew of his position, the law charged them with notice that the bank was a state depository and was required to give bond and security; and this was sufficient to put them on inquiry whether their vendor was not himself one of the sureties which he had, as president, to procure; and they were not purchasers without notice of the state's lien.

2. It was the duty of the president of the bank to make the bond and furnish the sureties thereon, and having executed it as pres dent, and signed it as surety individually, he could not be relieved from liability because the name of one of the sureties which he furnished, and which appeared on the bond after his own was signed, was forged, and not signed by such surety; and purchasers of property from him, who were charged with notice that he was a surety, were subrogated to his position, and could make no defence which he could not make.

(a.) It was therefore error to grant a new trial to such purchasers on the ground of the forgery.

3. State depositories are not public officers,. but are instruments or

agencies to keep the public funds. They are *sui generis* and *sui juris*, and stand on their own law, embodied in the act of 1879.

(*a.*) This differs from the case of the treasurer in 66 *Ga.*, 408.

(*b.*) The bond in this case was accepted, approved and kept in the executive office in substantial compliance with the law. It is not required that an entry of filing and recording should be made upon the bond. The recital by the governor, under the seal of the state, is sufficient evidence that the facts existed, unless overcome by proof to the contrary.

(*c.*) That the bond was executed a little before the appointment of the bank as a depository can make no difference. It was done in view of the appointment, and had to be executed and approved before it could enter upon the discharge of duty.

May 13, 1884.

State. Bonds. State Depositories. Liens. Notice. Vendor and Purchaser. Officers. Before Judge BRANHAM. Floyd Superior Court. March Adjourned Term, 1883.

An execution, issued by the governor against the Bank of Rome, as principal, and C. G. Samuel and certain other persons, as securities on its bond as a state depository, was levied on certain property as the property of Samuel, and Simpson & Ledbetter interposed a claim.

The act of 1879 (Code, §943 (a) to 943 (g)) provides for the appointment by the governor of " a solvent chartered bank of good standing and credit in each of the following cities of this state, . . . which shall be known and designated as state depositories," and regulates their duties and liabilities. Section 943 (d), on the subject of the bonds of depositories, is as follows :

"Each of said depositories shall, before entering upon the discharge of their duties, by their proper officers, execute a bond with good and sufficient securities, to be approved by the governor, in a sum of fifty thousand dollars. Said bond shall be conditioned for the faithful performance of all such duties as shall be required of them by the general assembly or the laws of this state, and for a faithful account of all the public money or effects that may come into their hands during their continuance in office. Said bond shall be filed and recorded in the executive office, and a copy thereof, certified by one of

the governor's secretaries, under the seal of the executive department, shall be received in evidence in lieu of the original in any of the courts of this state. And said bonds, when given, shall have the same binding force and effect, as the bond now required by law to be given by state treasurers, and, in case of default, shall be enforced in like manner."

On November 18, 1879, the governor appointed the Bank of Rome a state depository by the following order:

"By authority of an act of the general assembly, approved October 16, 1879, entitled an act to establish state depostories in certain cities of this state, and to prescribe their duties and liabilities, it is ordered:

That the Bank of Rome, a solvent chartered bank of this state, in the city of Rome, Georgia, be and is hereby appointed state depository for the term of four years from this date, subject to removal by the governor upon the condition named in said act; and the said Bank of Rome having, by its proper officers, executed a bond with good and sufficient securities in terms of the law, conditioned for the faithful performance of such duties as shall be required of it by the general assembly or the laws of this state, and for a faithful account of all the public money or effects that may come into its hands during its continuance in office, which bond has been approved by the governor, it is ordered that said Bank of Rome enter at once upon the discharge of its duties as such depository; and it is further ordered that the several tax collectors in the following counties, to-wit: Floyd, Polk, Chattooga, Walker, Haralson, Gordon, Whitfied, Catoosa and Murray, be, and they are hereby instructed and required to pay into said depository, and into no other, all moneys collected by them for and on account of state taxes, but, under the provisions of said act, money may be transmitted direct to the state treasurer by tax collectors."

The bank gave the following bond:

"Know all men by these presents, that we, the Bank of Rome, a body corporate, duly incorporated by act of legislature of the state of Georgia, approved by the governor, March, 2, 1874, as principal, and E. D. Frost, C. G. Samuel, W. L. Prentice, Mattie P. Deason, Samuel Morgan, as securities, do hereby acknowledge ourselves held and bound unto Alfred H. Colquitt, governor of said state of Georgia for the time being, and his successors in office, in the sum of fifty thousand dollars ($50,000.00), lawful money of the United States of America, subject to the following conditions:

"The conditions of the above obligations are such that whereas the above bound Bank of Rome, a corporation duly incorporated and chartered under the laws of the state of Georgia, as aforesaid, was duly appointed for the period of four years from the eleventh day of

November, eighteen hundred and seventy-nine, by his Excellency, Hon. Alfred H. Colquitt, governor as aforesaid, as, a state depository of the funds of the state of Georgia, under the act of the legislature of said state of Georgia, passed October sixteenth (16), eighteen hundred and seventy-nine (1879): Now, if said Bank of Rome shall faithfully perform all such duties as shall be required of it by the general assembly, or the laws of this state, under the act of October the 16th, 1879, or any future act of said general assembly of Georgia on this subject of state depositories, and shall faithfully account for all the public moneys or effects that may come into their hands during the continuance of the said bank of Rome as such state depository, under the act before cited as passed or to be passed; and further, that said Bank of Rome shall well and truly do and perform all and singular the duties required of it by law as state depository, either by act of October 16, 1879, or any future act of the general assembly of the state of Georgia on the subject of state depositories, according to the trust reposed in it, then the above obligation to be void; otherwise, of full force and effect.

BANK OF ROME,      [Seal.]
    by C. G. SAMUEL, Pres't.
J. S. PANCHEN,      [Seal.]
    Cashier, Bank of Rome.
E. D. FROST,          [L. S.]
SAMUEL MORGAN,   [L. S.]
C. G. SAMUEL,       [L. S.]
W. L. PRENTICE,    [L. S.]
M. P. DEASON,       [L. S.]"

Attest: PARK HARPER,
            J. B. HINE, Notary Public.

After the bond appears the following affidavit:

"Personally came before me, J. B. Hine, a notary public in and for the county and state aforesaid, E. D. Frost, C. G. Samuel, W. L. Prentice, Mattie P. Deason, Samuel Morgan, and upon oath state that they are worth the amounts set opposite their respective names, as herewith stated in this affidavit, over and above all debt and liabilities whatever, and over and above all right to claim of homestead or exemption under the laws of this state; E. D. Frost, fifty thousand dollars; Samuel Morgan, fifty thousand dollars; C. G. Samuel, thirty-five thousand dollars; W. L. Prentice, twenty thousand dollars; Mattie P. Deason, ten thousand dollars.

(Signed)    E. D. FROST,
                C. G. SAMUEL,
                W. L. PRENTICE,
                M. P. DEASON,
                SAMUEL MORGAN."

J. B. HINE, Notary Public.    [Seal.]

The copy of the bond used in evidence was certified by the secretary of the executive department; that it was "a true copy of the original bond on file in this office, and that said original has on it no entry of filing, approval or of record."

On April 1, 1881, the governor issued an execution against the Bank of Rome and E. D. Frost, Samuel Morgan, C. G. Samuel, W. L. Prentice and M. P. Deason, as sureties, for $50,000 00. This execution recited the appointment of the bank as a depository; that the defendants made and executed the bond in the sum of $50,000.00, the principal through its president and cashier, and each of the sureties signing, sealing and delivering it as required by the act of the legislature; that the bank had received $53,015.76 which it failed to account for " after its acceptance of the office of a state depository, and after the execution of the bond aforesaid, and after the same was duly approved by the governor and filed and recorded in the executive office." It was levied on the land claimed.

Simpson & Ledbetter purchased the land levied on from Samuel, taking a bond for titles, on January 10, 1881, and giving two notes for the purchase money, due thirty days after date, for $1,700.00 each. They testified that these notes were paid on February 12, 1881. Each of them testified that he did not know, at the time of the purchase or payment, that Samuel was on the bond of the bank. Ledbetter stated that he did not know that the bank was a state depository; Simpson stated that he had heard of it, but did not know it of his own knowledge; both of them knew that Samuel was president of the bank. Ledbetter stated that he had the records of the county examined, and found the title apparently regular.

The jury found the property subject. Claimants moved for a new trial, on the following grounds:

(1.) Because the verdict is contrary to law in this: The governor, under the law and the facts as proved, had no legal power or authority to issue the execution offered in

evidence, because the bond was not made, executed, filed, approved and recorded, as required by law.

(2.) Because the verdict is contrary to evidence, and the weight of evidence.

(3.) Because the verdict is against the following charge of the court: "Now the claimants say that they took the property discharged from the lien of the state, because they were *bona fide* purchasers of the property for value, without notice of the state's lien. Now, if they were *bona fide* purchasers of the property for value without notice, then they would be protected, and the state's lien would be defeated."

(4.) Because the court charged as follows: "There are two kinds of notice, actual and constructive notice. If these parties had either, they would not take the property discharged from the lien of the state. It is for you to find whether they had notice or not of the fact that Samuel was one of the sureties for the Bank of Rome,—not that they had notice that the Bank of Rome was a state depository, and had given a bond, but whether they had notice that C. G. Samuel was one of the securities on that bond; and any circumstances or facts of which they were apprised, and which were sufficient to put a prudent man on inquiry, would be sufficient proof of notice."

(5.) Because the court charged as follows: "If you find that they had no actual notice, then you will inquire whether they had constructive notice. The law makes certain things notice, whether the parties knew the facts to exist or not, such as a deed, if it is recorded; the law calls that constructive notice. Now, if you find that the bond was made by the Bank of Rome, and executed on the 18th of November, 1879, and you will look to the records, which will be out before you, as well as the oral testimony, and if you find that the bond was filed, and placed on file or lodged in the executive office, and remained there at the time that Simpson & Ledbetter bought this property, and if it was lodged there before that date, the law pre-

sumes it was there then, unless the evidence shows affirmatively that it was not there, because that was the place where it belonged, then Simpson & Ledbetter would have constructive notice, and would not be purchasers for value without notice."

(6.) Because the court charged as follows: "In reference to constructive notice, I charge you that, if the bond was placed in the executive office at Atlanta before the purchase by Simpson & Ledbetter was made, and if that bond was placed there with Samuel's name as one of the securities, the presumption would be, that the bond remained there, unless there is some proof that the bond was taken away from the executive office. If it has been shown that the bond was there at the time of the purchase by Simpson & Ledbetter, the presumption is that it remained there, because that was the place where it belonged; or if the bond was there before the purchase, then it would amount to constructive notice, amounting in effect to the same thing as in the case of a deed that has been recorded in the clerk's office, whether they had actual notice of the fact or not."

(7.) Because the court admitted, over objection, the execution issued by the governor.

(8.) Because the court rejected evidence offered to show, by A. W. Ledbetter, that inquiry about liens and encumbrances was made of Samuel, and assurances made by him that there were none. [The court referred to the brief of evidence for a correct statement of what transpired in this connection. From this the following colloquy appears:

Question: "State where that purchase money came from, and what Samuel said when you paid for this property?"|

Answer: "He represented to us that he"— (objections sustained.)

Q.: "Just state what you know of your own knowledge?"

A.: "I will state that Mr. Samuel came to me and said "——

(Mr. Anderson: "Don't state what he said.")

Witness: "He (Samuel) came to me, and sold me this property, and I paid him for it, and he said that he wanted to pay off an overdraft in the bank." (This testimony rejected.)

The court: "What Mr. Samuel said is not testimony. Samuel can testify what he knows himself. What was done, and what you know of your own knowledge, you can testify to, but you cannot repeat the sayings of Samuel."]

(9.) Because of newly discovered testimony to show that Mattie P. Deason did not sign the bond, or authorize any person to sign her name as a security; that it was not executed in the presence of an officer authorized by law or employed by the governor to witness or approve the same; that Mattie P. Deason and William L. Prentice did not justify or sign the affidavit attached to the bond. [On this ground, affidavits *pro* and *con* were introduced, which were directly conflicting.]

The Court granted a new trial, and the state, in the name of the governor, excepted.

C. ANDERSON, attorney general; JACKSON & KING, for plaintiff in error.

UNDERWOOD & ROWELL, for defendants

JACKSON, Chief Justice.

The bank of Rome was made a depository under the act of 1879, and gave a bond, with sureties thereon, to account for all money entrusted to it as such depository. The governor, under the act, issued execution against it and the sureties, which was levied on property claimed by defendants in error. The jury, on the trial of the claim, found the property subject. The court granted a new trial, and the state excepted.

1. These claimants hold title from Samuel, the president of the bank, not as president, but individually. The law informed them that the bank was a state depository. They knew that Samuel was its president, and that it had to give bond and security. That was enough to put them on inquiry whether he himself was not one of the sureties he had, as president, to procure. Therefore, they were not purchasers without notice of the state's lien.

2. Nor do we think that the fact that M. P. Deason did not sign, but her name was forged to the bond, protects them. Their grantor or vendor was the chief officer, the president of the bank; it was his duty, not only to make the bond, but to furnish the sureties; he did execute it as president for the bank, and as surety individually, before Mrs. Deason's name appeared upon it as surety, and he could not ask to be relieved from liability because the name of one of the sureties which he furnished was upon the bond, forged by some one, and not signed by her.

Being charged with notice that he was surety, these claimants stand in his shoes, and can make no defence which he could not make. Therefore, we think that the court erred in granting a new trial to Simpson & Ledbetter, on the ground of the alleged forgery of the name of Mrs. Deason as Samuel's co-surety.

3. The only remaining question is this: Is the bond such an instrument as can be executed by summary process by the executive of the state? That depends upon the answer to the question, whether the act of 1879 has been substantially complied with, so as to make it a valid bond under that act which created these bank depositories, and prescribed the mode of the execution of the bond, and the remedies which the state might use in enforcing the bond against the parties to it, in case of breaches thereof.

We do not regard these depositories of the money received from the treasurer or collectors of taxes, in the districts fixed by law for collectors to pay immediately to them, as public officers of the state, in the sense of that term as used in the Code, from section 148 to 171, inclusive. A bank can hardly be called an officer. It cannot well be tried for misdemeanor and punished, under section 156 of the Code; and the entire chapter appears to us to be dealing with individuals, not banks. It is true, that the act of 1879, section 943 (d) of the Code, does use the term "during their continuance in office," and the act amenda-

tory thereof, pamphlet laws of 1882–3, p. 136, in the second section thereof, uses the words, " the governor shall declare said office vacant;" but the word " office " is used in the sense of place, position, agency, and not, we think, in the sense that it is a public officer. In the very same section of the act of 1883, the words used are, " and the governor may declare the position vacant," thus using the two words as synonymous. The truth is that these banks are mere depositories of public money. They are somewhat like the Bank of the United States was, a depository of funds of the government for safe keeping; or, as certain state banks were for a time, under the administration of President Jackson, similar depositories. But no one would therefore rationally call either the old United States bank, or the state banks so used as depositories, public officers of the United States. They were agencies to keep the public money of the United States, and these are agencies of our treasury system, in like manner, to keep our public money; but the corporation in the one case was not a public officer of the United States, and in the other, these corporations are not public officers of this state. They are paid no salary under the act of 1879, but the governor is to make terms with them for the use of the state's money. They are to pay such interest as the governor, by "the most advantageous contracts he can " make, may be able to secure from them. Public officers, the treasurer for instance, are prohibited from making interest or other profitable private use of public money by the constitution. Code, §5124. " If the state treasurer, or any other officer of this state, shall use, directly or indirectly, the money of this state, such officer shall be deemed guilty of a felony, and on conviction shall be punished by imprisonment in the penitentiary, for any time not less than five, nor longer than twenty years," is the emphatic legislative act of the same session of the legislature of 1879, which organized these depositories. Code, §4425 (a). How inconsistent it would be that the same legislature

should pass an act to punish public officers for doing that which it was made the duty of the governor to contract with them for doing! It is clear, therefore, that they are not public officers, as understood by the general assembly which created the depositories. It follows that these depositories are instruments or agencies *sui generis* and *sui juris*, standing on their own law, embodied in the act of 1879, codified in sections 943 (a) to 943 (g) inclusive, of the Code of 1882, and the amendatory act of September 28, 1883, pamphlet, p. 136; Laws, p. 138.

It follows, too, that the principles ruled in the case of *Mayo, sheriff, vs. Renfroe and Wilson*, 66 *Ga.*, 408, on the law relating to bonds of public officers, in that part of the Code from section 148 to 171, have no application to this bond. It stands or falls on the acts above cited, which alone controls it. Except that it refers to the treasurer's bond in respect to its "binding force and effect," and the provision that "it shall be enforced in like manner," it draws from no other law, and its validity and enforcement summarily will be found in sections 91 (a) and 97 (b) of the Code, taken from the act of 1876, pp. 127, 132. Section 91 (a) provides that "a lien is hereby created in favor of the state upon the property of the treasurer to the amount of said bond, and upon the property of the securities upon his said bond to the amount for which they may be severally liable, from the date of the execution thereof;" and section 97 (b) provides that upon its breach, "it shall not be necessary to sue his official bond, but the governor is hereby authorized to issue a *fi. fa. instanter* against the treasurer and his securities for the amount due the state by the treasurer, with the penalties and costs."

Therefore, what is said in that decision as to the time within which that bond of Renfroe was filed, or its execution within forty days from his election, or as to the time prescribed by law for its record in the office of the secretary of state, or in regard to the oath required of each surety

in respect to what he was worth, and its being attached to the bond, and in regard to the construction of section 167 upon the point whether it gives a summary remedy, though the bond be not a valid statutory, but only a common law bond, has no application to the case at bar.

So far as that case is concerned, the court, as now constituted, think as the court which then unanimously decided, that the judgment could not have been otherwise than as rendered. The special legislation which fixed the amount due, and required the execution to issue for that sum, was enough of itself to sanction that judgment as absolutely demanded by the constitution itself.

The question here is, was this bond executed in such manner as to make it a valid bond under the act of 1879? For the amendatory act of 1883 was passed long after its execution, and does not affect its validity or enforcement.

That act of 1879 requires that it be in the sum of fifty thousand dollars. It is in that sum. It is to be approved by the governor. It is approved by him. It must "be conditioned for the faithful performance of all such duties as shall be required of the depository by the general assembly or the laws of the state, and for a faithful account of all the public money or effects that may come into their hands during their continuance in office." The condition of this bond is, that the bank "shall faithfully perform all such duties as shall be required of it by the general assembly or the laws of this state, under the act of Octobr 16, 1879, or any further act of said general assembly of Georgia on this subject of state depositories, and shall faithfully account for all the public moneys or effects which may come into their hands during the continuance of said bank of Rome as such state depository, under the act before cited as passed or to be passed; and further, that said Bank of Rome shall well and truly do and perform all and singular the duties required of it by law as state depository, either by act of October 16, 1879, or any future act of the general assembly of the state of Georgia on the subject of

state depositories, according to the trust reposed in it." It is thus seen that the condition of the bond is not only in the terms of the act, but it amplifies and enlarges them.

Lastly, the bond by the statute is "to be filed and recorded in the executive office, and a copy thereof certified by one of the governor's secretaries, under the seal of the executive department, shall be received in evidence in lieu of the original in any of the courts of this state." Within what time it is to be filed and recorded is not specified in the act. It is recited, in the executive order appointing the bank, that it was approved by the governor, and it is recited, in the execution issued by the governor and signed by him with the seal of the state, that it " was duly filed and recorded as required by law." And one of the secretaries certifies that the copy in evidence is " a true copy of the original bond of file in this office." It is true, that he also says in the certificate that there is no entry on it of filing, recording or approval. The statute does not require that entry to be made on it. It is enough that it be done; and that it was accepted and approved by the governor, and of file in the executive office, is beyond all dispute; and there is no evidence that it was not recorded; but the evidence goes only to the point that no entry of record was on it; and no such entry upon it was required. The recital by the governor, under the seal of the state, is sufficient evidence that the facts existed, unless overcome by proof to the contrary. Besides, it could be recorded nowhere but on the minutes of the executive department, and the filing therein made it as accessible to the public as such record would be. The object of recording is its preservation and the ease of making a copy when necessary. So that claimants were charged with constructive notice of the bond and sureties thereto.

We hold, therefore, that the bond was executed and accepted and approved and kept in the executive office in substantial compliance with the law. That it was executed a little before the appointment of the bank can make

v 72-34

no difference.   It was done in view of the appointment, and had to be executed and approved before it could enter upon the discharge of duty.

We are therefore of the opinion that the verdict of the jury in the case was right, and as the law of the case was given to the jury substantially in accordance with the views of the case hereinbefore expressed, and there is no error therein which could operate to make the verdict otherwise, we must reverse the judgment which granted the new trial.

Judgment reversed.

Cited for plaintiffs in error: 66 *Ga.*, 408; 1 *Id.*, 580; 3 *Id.*, 542; 6 *Id.*, 552; 9 *Id.*, 316; 5 *Id.*, 570; 44 *Id.*, 437; 60 *Id.*, 478; 62 *Id.*, 142, 187; 10 *Id.*, 417; 11 *Id.*, 286; Code, §§135, 154, 155, 156, 167, 169; 11 Wheat, 188; 1 Peters, 318; 3 Mason, 446; 33 Ala., 692; 4 *Id.*, 403; 62 *Id.*, 404; 64 *Id.*, 122; 23 Tenn., 487; 1 Ware's R., 212; 49 Iowa, 576; 16 Wallace, 1; 2 Metcalf, (Ky.), 617; 53 Me., 284; 10 Cent. Law Jour., 176; Brandt on Suretyship, 358; 63 Mo., 216; reviewing and qualifying, 52 Mo., 75; 51 Me., 506; 3 O. St., 307; 6 Gray —; 3 Bush, 562.

For defendants: 17 *Ga.*, 522; 54 *Id.*, 83, 43; 47 *Id.*, 427; 43 *Id.*, 9; 52 *Id.*, 658, 560; 6 *Id.*, 202; 55 *Id.*, 287; 33 *Id.*, 332; 10 *Id.*, 414; 56 *Id.*, 439; 64 *Id*, 740; 63 *Id.*, 486, 540; 10 Pet., 596; 7 Wheat, 46; 5 S. & P. (Ala.,) 326; 2 Johns. Chan., 182, 604; 3 Wend., 208; 14 Am., 389; 25 *Id.*, 706: 29 *Id.*, 371; 33 *Id.*, 372; 28 Am. Dec., 680; 21 Am. R., 46; 11 Am. Dec., 111; 9 Am. R., 445; 5 *Id.*, 446; 21 Wall., 657; 51 Mo., 133; 62 Ill., 12; 44 Iowa, 537; 6 Exch., 89; 12 Wall., 47; 3 Bush, 361; 22 Ind., 399; 27 Ill., 173; 32 N. Y., 453; 4 Watts (Pa.), 53; 16 Wallace, 5; 53 Mo., 516; 3 Ala., 88; 52 Mo., 75.